FILED
**United States Court of Appeals**
**Tenth Circuit**

**January 22, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

CALVIN JAMES WOODMORE,

    Defendant - Appellant.

No. 23-7044

_____

**Appeal from the United States District Court**
**for the Eastern District of Oklahoma**
**(D.C. No. 6:20-CR-0004-JFH-3)**
_____

John A.L. Campbell, Aston, Mathis, Campbell PLLC, Tulsa, Oklahoma, for Defendant-Appellant.

James R.W. Braun, Special Assistant U.S. Attorney (Christopher J. Wilson, United States Attorney with him on the brief), Muskogee, Oklahoma, for Plaintiff-Appellee.
_____

Before **HOLMES**, Chief Judge, **SEYMOUR**, and **BALDOCK**, Circuit Judges.
_____

**HOLMES**, Chief Judge.
_____

Defendant-Appellant Calvin Woodmore appeals from his convictions and sentence related to his involvement in a methamphetamine-trafficking ring that operated in eastern Oklahoma. At trial, Mr. Woodmore was convicted of conspiracy to commit drug trafficking, conspiracy to commit money laundering, and money

laundering. On appeal, he raises several challenges. First, he argues that the district court erred by failing to properly instruct the jury in two separate ways—*viz.*, by failing to provide a definitional instruction for the term "methamphetamine (actual)" and by delivering an instruction involving the right of attorneys to interview witnesses prior to trial. Second, he contends that the district court erred by denying his motion for a judgment of acquittal as to the conspiracy to commit money laundering count and the money laundering count, arguing that the government did not adduce sufficient evidence at trial to support either count. Finally, he argues that the district court erred in various ways in calculating his sentence.

For the reasons explicated *infra*, we reject each of Mr. Woodmore's challenges. Accordingly, exercising jurisdiction under 28 U.S.C. § 1291, we **affirm** Mr. Woodmore's convictions and sentence.

**I**

**A**

**1**

In July 2018, the Sheriff of Haskell County, Oklahoma, informed the Drug Enforcement Administration ("DEA") that an individual in eastern Oklahoma was obtaining large quantities of methamphetamine through the mail. The Sheriff explained that he had connected these shipments to an individual named Early Woodmore. Working alongside numerous local, state, and federal law enforcement agencies, the DEA launched a joint investigation into Early and his drug-trafficking organization (the "Woodmore organization").

2

The Woodmore organization consisted of at least a dozen members, including three siblings of the Woodmore family. Early Woodmore ("Early"), the leader of the organization, was aided by his brother, Calvin Woodmore ("Mr. Woodmore")—the Defendant-Appellant in the instant case—and their sister, Amber Woodmore ("Amber"). The Woodmore siblings were aided by at least nine other individuals, some of whom were longtime acquaintances of the Woodmore family and fellow residents of eastern Oklahoma.

In January 2017, Choice Needham—a methamphetamine user and small-time dealer—asked Mr. Woodmore if he knew of a way for her to obtain methamphetamine. Mr. Woodmore directed her to his brother, Early, who provided her with a small amount of methamphetamine. Thereafter, Ms. Needham became romantically involved with Early and helped him with his drug-trafficking business by weighing the methamphetamine, separating it, and storing the money that methamphetamine purchasers dropped off for Early.

Later that year, in August 2017, Early met a new supplier of methamphetamine, Kimberly Noel. Ms. Noel, who lived in Desert Hot Springs, California, was introduced to Early through her son-in-law, Josh Sustaire, a close friend of Early's. Mr. Sustaire asked Ms. Noel if she had access to methamphetamine, and she soon began supplying methamphetamine to both Mr. Sustaire and Early. After the first transaction—in which Mr. Sustaire served as the middleman between Ms. Noel and Early—Ms. Noel began communicating with Early and his sister, Amber, directly.

3

Every few weeks, Ms. Noel would mail methamphetamine concealed in everyday objects (such as peanut butter jars) from California to various addresses in and around eastern Oklahoma, including the residences of other Woodmore organization associates. Once the packages arrived at the designated destinations, a Woodmore organization associate would retrieve and break down each package of methamphetamine into smaller drug quantities.

Early typically tasked Woodmore organization associates with selling the methamphetamine locally. But Early also occasionally sold methamphetamine personally. For example, on November 6, 2018, a confidential source for the DEA bought 55.7 grams of methamphetamine from Early for $800; the purchased methamphetamine was later tested and determined to be "98 percent pure plus or minus four percent," with a corresponding pure substance weight of "54.5 grams" (that is, a little less than two ounces). R., Vol. IV, at 53–54 (Trial Tr., Vol. I, dated Apr. 4, 2022).

Ms. Noel typically sent the Woodmore organization one pound of methamphetamine per shipment. According to a DEA agent, the price per pound fluctuated throughout the period of the Woodmore organization's operations, ranging from roughly $2,000 to $4,000. Ms. Noel testified that the price per pound of methamphetamine decreased over time, beginning at $3,200 and reaching as low as $1,800. In total, during the course of her business relationship with Early, Ms. Noel shipped the Woodmore organization between twenty and thirty pounds of methamphetamine.

4

In return, Early or one of his associates would send Ms. Noel a portion of the proceeds via wire transfers.  For example, Ms. Noel testified that in one transfer, she received $9,200.  *See id.* at 230 (Trial Tr., Vol. II, dated Apr. 5, 2022).  Of the portion that she received, Ms. Noel typically kept $500 of each transfer as her "finder's fee" for facilitating the sale; occasionally, however, she retained additional money, including $3,000 to assist her recently evicted mother and approximately $5,000 to buy a car.  *Id.* at 230–31, 249.  She applied the rest of the money that she received toward future purchases of methamphetamine.  When asked about Ms. Noel's cut, Ms. Needham testified that although she did not know the specifics of the arrangement between Early and Ms. Noel, she was aware that Early "was supposed to send [Ms. Noel] money for bills and cars and stuff like that."  *Id.* at 158.

The Woodmore organization transferred Ms. Noel her proceeds through wire transfer platforms like MoneyGram, Western Union, and PayPal.  *See id.* at 155, 314.  Early sometimes wired the money himself, but he otherwise relied on other Woodmore organization associates to do so.  For example, Ms. Needham sent so many wire transfers to Ms. Noel that Ms. Needham was eventually "flagged" by multiple wire transfer platforms for sending a suspiciously high number of transfers.  *Id.* at 167.  Similarly, because Ms. Noel also was flagged by the wire transfer platforms, she used friends and family members to receive the money for her.  One such recipient was her brother, Jerry Austin.  Ms. Noel and Early would regularly speak on the phone to coordinate the payment amounts, the identities of the senders and recipients, and the dates of transmission.

5

In addition to the methamphetamine, Ms. Noel would mail Early luxury "merchandise," including purses, apparel, smart watches, and iPads. *Id.* at 229, 252–56. Ms. Noel would legally purchase this merchandise for a steep discount—as low as "a dollar" for some of the luxury purses—at a local charity she worked at in California. *See id.* at 252–54. In return, Early would occasionally send Ms. Noel "a couple of thousand dollars" for the merchandise. *Id.* at 229, 256. Early sent this money via some of the same wire transfer platforms that he used to send Ms. Noel payments for methamphetamine—specifically, Western Union and MoneyGram. Ms. Noel was unsure what Early was doing with the merchandise items she sent him—that is, whether he was reselling them for a profit or keeping them for himself. But Early was aware that Ms. Noel was purchasing the merchandise for low prices. Law enforcement officials ultimately documented ninety-three packages that Ms. Noel sent to the Woodmore organization; some of those packages contained methamphetamine whereas others contained merchandise. *See id.* at 211–12, 252; Suppl. R., Vol. I, at 1 (Pl.'s Ex. No. 27, Package Log).

Aside from his methamphetamine business, Early did not have a job. His ex-wife, Lacey Ford, testified that she was "[n]ot . . . aware of" any regular employment Early had between 2017 and 2020. R., Vol. IV, at 350. He did, however, train "up to [ten]" horses at his residence. *Id.* at 183–84. Early had friends and family help take care of the horses for him. According to Ashley Miller, Early's then-girlfriend, Early did not make much money from training these horses.

6

**2**

Although Mr. Woodmore was not the leader of the Woodmore organization, he nonetheless participated in its operations to a significant degree.  For example, Ms. Miller testified that Mr. Woodmore was Early's primary debt collector when other methamphetamine dealers or users owed Early money.  Although Ms. Miller rarely saw Mr. Woodmore, she observed him handling methamphetamine a few times and noted that he would help break down the methamphetamine packages shipped by Ms. Noel.

Other Woodmore organization associates also recognized Mr. Woodmore's involvement in the organization's activities.  Dennis Marshall, who was incarcerated with Mr. Woodmore in the Pittsburg County jail, stated that Mr. Woodmore instructed him to "get with" Early after his release to discuss trafficking methamphetamine.  *Id.* at 600–01 (Trial Tr., Vol. III, dated Apr. 6, 2022).  Mr. Marshall also testified that he had previously purchased methamphetamine from Mr. Woodmore directly.[1]  Likewise, Tiffany Davis, a methamphetamine user and Mr. Marshall's then-girlfriend, testified that she too bought methamphetamine directly from Mr. Woodmore.  And Dennis Eaton, a methamphetamine distributor for the Woodmore organization, testified that Mr. Woodmore and Early took part in a group

---

[1]     Because Mr. Marshall had failed to fully pay Mr. Woodmore for the methamphetamine he bought, Mr. Marshall decided to receive packages for the Woodmore organization "[t]o help pay off the debt."  R., Vol. IV, at 623–24.

assault on him because they believed that he had kept methamphetamine for himself that he was supposed to resell.[2]

In addition, Mr. Woodmore's residence served as a destination for Ms. Noel's packages. In total, the government logged eleven packages shipped between December 31, 2018, and March 1, 2019, from Ms. Noel to a home in McAlester, Oklahoma, that Mr. Woodmore occupied with his wife, Valerie Adcock. *See id.* at 312, 764; Suppl. R., Vol. I, at 1. Notably, however, Mr. Woodmore was incarcerated from October 23, 2018, to February 27, 2019.

On October 19, 2018, Mr. Woodmore attempted, unsuccessfully, to transfer $2,000 to Mr. Austin, Ms. Noel's brother. R., Vol. IV, at 228–29; Suppl. R., Vol. I, at 2–6 (Pl.'s Ex. No. 48, MoneyGram Spreadsheet). Ms. Noel testified that she could not recall the purpose of this failed transaction and stated that the money could have been payment for either methamphetamine or merchandise. She noted that "[s]ometimes, [but] not always," the payment for the merchandise totaled roughly $2,000. R., Vol. IV, at 229. She also explained that, consistent with their usual practice, she and Early would have spoken about the transfer before it was sent but that she did not recall the specific conversation related to that transfer. Nevertheless, Ms. Noel made clear that neither Mr. Woodmore nor Early knew Mr. Austin, so the

---

[2]     Mr. Eaton's testimony at trial was corroborated by Anjel Kennedy, Mr. Eaton's former romantic partner, who testified that Mr. Woodmore, Early, and Mr. Marshall assaulted Mr. Eaton. R., Vol. IV, at 404, 407–410. Ms. Kennedy also stated that she was assaulted by Mr. Marshall during this altercation.

transaction was undoubtedly related to her transactions with the Woodmore organization.

Ms. Needham testified that she was not aware of Mr. Woodmore ever having a job during the period of the Woodmore organization's drug-trafficking operations. A MoneyGram spreadsheet introduced at trial listed Mr. Woodmore's occupation as "retire[d]." Suppl. R., Vol. I, at 4 (capitalization omitted). Mr. Woodmore did, however, help Early with the horses on Early's property, although Ms. Needham testified that Mr. Woodmore only "helped him some out there." R., Vol. IV, at 185.

**3**

In April 2019, roughly a year after the DEA began investigating the Woodmore organization, federal agents obtained arrest warrants for Mr. Woodmore and Early for assaulting Mr. Eaton earlier that year. Simultaneously, investigators were monitoring a package shipped by Ms. Noel that was due to arrive at Mr. Marshall's residence in McAlester, Oklahoma on April 2, 2019. After the package arrived, Mr. Woodmore drove by Mr. Marshall's residence and, according to Mr. Marshall, confirmed that the package was in Mr. Marshall's possession. Mr. Woodmore also warned Mr. Marshall "to be careful" because he had seen "two suspicious vehicles down the road." R., Vol. IV, at 630. Law enforcement officers arrested Mr. Woodmore later that day and arrested Early approximately one month later. Both Mr. Woodmore and Early have been incarcerated since these arrests.

After her brothers' arrests, Amber assumed control of the Woodmore organization's day-to-day operations. However, the Woodmore brothers continued to

communicate with Amber about the Woodmore organization's operations from prison. Though Ms. Noel initially stopped sending packages after hearing of Early's incarceration, she resumed sending shipments after speaking with Amber. Amber asked Ms. Noel, however, to change shipment destinations because the Woodmore brothers thought "it was getting hot"—i.e., that law enforcement was closing in on them—after the brothers' arrests. *Id.* at 233. Ms. Noel complied and began sending packages to a motel in Rogers, Arkansas—a location near eastern Oklahoma—where Ms. Noel's sister worked.

On August 15, 2019, investigators planned to seize a package shipped by Ms. Noel that was due to arrive at the Rogers, Arkansas motel. That evening, Mr. Woodmore twice called Ms. Adcock on a recorded line from jail and asked her to check if the package had been delivered.[3] Ms. Adcock replied that the package had not yet arrived.

Investigators ultimately intercepted the package in Arkansas on August 16, 2019, before it reached the motel. Subsequent testing revealed that the seized package contained methamphetamine that weighed 444.4 gross grams—of that amount, "439.9 gross grams, [or] approximately one pound" was pure methamphetamine. R., Vol. IV, at 747–48. This represented a purity level of 99

---

[3]    Specifically, Mr. Woodmore asked Ms. Adcock if she had "[g]ot ahold of ol' boy," to which Ms. Adcock replied, "[i]t's not there yet." R., Vol. III, at 184 ¶ 24 (Draft Presentence Investigation Rep., prepared Oct. 26, 2022). A federal task force officer for the DEA testified that in the call Mr. Woodmore "was telling [Ms. Adcock] to check on the package because there was a package en-route that day." R., Vol. IV, at 773; *see also id.* at 784.

percent. *Id.* at 748. After this seizure, Ms. Noel ceased sending packages to the Woodmore organization.

**B**

**1**

On January 14, 2020, a federal grand jury in the Eastern District of Oklahoma indicted Mr. Woodmore and eleven other defendants, including Early, Amber, and Ms. Noel. Mr. Woodmore was charged with three counts: Count One, conspiracy to "knowingly and intentionally distribute 50 grams or more of methamphetamine (actual)" in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846, R., Vol. I, at 26 (Indictment, dated Jan. 14, 2020); Count Nine, conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956(a)(1) and 1956(h), *see id.* at 40 (describing the alleged "money laundering conspiracy" (bold-face font and capitalization omitted)); and Count Thirteen, money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 2, *see id.* at 44 (alleging "laundering [of] monetary instruments" (bold-face font and capitalization omitted)). The Indictment listed the same transaction as the basis for Counts Nine and Thirteen: specifically, Mr. Woodmore's attempted $2,000 wire transfer to Mr. Austin on October 19, 2018.

Mr. Woodmore exercised his right to a jury trial, and he and Early proceeded to trial jointly in April 2022.[4] At trial, the government presented testimony from several co-conspirators of the Woodmore organization, including Ms. Noel, and

---

[4] Mr. Woodmore and Early were represented by separate counsel at trial.

multiple law enforcement officers.  Notably, during trial, both Ms. Miller and Mr. Marshall testified that they met with prosecutors in advance of trial to discuss their testimony.  *See* R., Vol. IV, at 338–39, 648.

**2**

At the conclusion of the government's evidence, Mr. Woodmore moved for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure.  As relevant to this appeal,[5] Mr. Woodmore asserted that the government had not proven beyond a reasonable doubt that he had laundered money, as alleged in Count Thirteen, because no evidence showed that Mr. Woodmore's attempted $2,000 transfer was sent for criminal purposes.  In support, he highlighted Ms. Noel's testimony that she did not know whether this money was payment for methamphetamine or merchandise, and he argued that no other evidence addressed the actual purpose behind the transfer.  Mr. Woodmore reasoned that allowing the jury to consider Count Thirteen would require them to speculate about the transfer's purpose.

Mr. Woodmore challenged the money laundering conspiracy charge in Count Nine on the same grounds.  He maintained that no witness testified that he "ever asked anybody to launder any money" and, as a result, that his "only role in this money laundering conspiracy could have been" the attempted $2,000 transfer.

---

[5]    Mr. Woodmore also challenged the government's evidence against him on the conspiracy to distribute methamphetamine charge (Count One), but he only appeals from the district court's denial of his Rule 29 motion as to the charges related to money laundering (Counts Nine and Thirteen).

R., Vol. IV, at 791–92. Further, he reiterated that the government offered no evidence showing that the $2,000 at issue were proceeds of methamphetamine trafficking. Mr. Woodmore connected the two money laundering charges against him, arguing that if the district court granted his Rule 29 motion as to Count Thirteen, then granting the motion as to Count Nine should logically follow "because there was no evidence presented that he was engaged in any other form of alleged money laundering" separate from the attempted transfer. *Id.* at 792.

Referencing the high bar for granting a judgment of acquittal, but without articulating its specific reasons, the district court denied Mr. Woodmore's Rule 29 motion on all counts.

**3**

Two decisions made by the district court with respect to the jury instructions are relevant on appeal. First, the court charged the jury with an instruction that used the term "methamphetamine (actual)" in describing Count One of the Indictment, which also used that term. *Compare* R., Vol. I, at 362 (Jury Instructions, filed Apr. 7, 2022) (noting in a final instruction that Mr. Woodmore "is charged with conspiracy to knowingly and intentionally distribute and/or possess with intent to distribute 50 grams or more methamphetamine (actual), a Schedule II controlled substance"), *with id.* at 26 (charging Mr. Woodmore with a conspiracy to "knowingly and intentionally distribute 50 grams or more of methamphetamine (actual)"). Apparently anticipating that the court might do so, Mr. Woodmore had proposed an

13

instruction that would include a definition for that term.[6]  The proposed instruction

read:

> In this case, the Defendants are charged with various offenses related to the possession and/or distribution of "Methamphetamine (actual)."  Controlled substances are often diluted and combined with other substances as they pass down the chain of distribution.  In this case, should you find that Defendants possessed and/or distributed a mixture of [sic] substance containing methamphetamine, you must also determine the amount of methamphetamine (actual) contained therein.

> The term "Methamphetamine (actual)" refers to the weight of the controlled substance, itself, contained in the mixture or substance.  For example, a mixture weighing 10 grams containing methamphetamine at 50% purity contains 5 grams of Methamphetamine (actual).

R., Vol. I, at 341 (Defs.' Requested Jury Instrs., filed Apr. 7, 2022).  As authority for

the instruction, Mr. Woodmore cited the United States Sentencing Guidelines

("U.S.S.G." or the "Guidelines")—specifically, the commentary of U.S.S.G. § 2D1.1.

*Id.*  The district court ultimately denied the proposed instruction, finding that it

would not "be helpful" to the jury "based upon the evidence."  *See* R., Vol. IV, at 832

(Trial Tr., Vol. IV, dated Apr. 7, 2022).

Second, the court gave an instruction addressing the propriety of attorneys

interviewing witnesses before trial.  Specifically, the government had proposed an

---

[6]    The instruction was initially proposed by Early Woodmore's counsel, and Mr. Woodmore's counsel subsequently stated that he "adopt[ed] the concerns expressed by [] Early's counsel" with respect to the instruction.  R., Vol. IV, at 815.

instruction regarding the rights of attorneys to interview witnesses prior to trial.[7]  In full, that instruction read:

### Right of Attorney to Interview Witnesses

An attorney has the right to interview witnesses for the purpose of learning the testimony those witnesses will give.  The fact that the witness has talked to an attorney and told the attorney what he or she would testify to does not, by itself, reflect adversely on the truth of the testimony of the witness.

R., Vol. I, at 138 (Pl.'s Requested Jury Instrs., dated Feb. 26, 2021).  Mr. Woodmore objected to the proposed instruction, disagreeing with the premise that "an attorney has a right to interview witnesses" because defense counsel "had no right to talk to" most of the government's witnesses since "they were represented by counsel and their attorneys certainly would not have allowed [defense counsel] to talk to them." R., Vol. IV, at 812.

In response to Mr. Woodmore's objection, the district court edited the instruction to read that "[a]n attorney *may* have the right," but otherwise left the instruction the same.  *See id.* (emphasis added).  The following day, after the district court provided Mr. Woodmore with a revised copy of the jury instructions, he raised the "[s]ame objection as yesterday" to the instruction.  *Id.* at 833.  The district court noted and overruled his objection.  *Id.*  The final instruction delivered to the jury read:

---

[7]     Recall that both Ms. Miller and Mr. Marshall testified that they met with prosecutors in advance of trial to discuss their testimony.  *See* R., Vol. IV, at 338–39, 648.

**RIGHT OF ATTORNEY TO INTERVIEW WITNESSES**

An attorney may have the right to interview witnesses for the purpose of learning the testimony those witnesses will give. The fact that a witness has talked to an attorney and told the attorney what he or she would testify to does not, by itself, reflect adversely on the truth of the testimony of the witness.

R., Vol. I, at 357.

**4**

At the conclusion of trial, the jury convicted Mr. Woodmore on all three counts. *Id*. at 383–84 (Verdict Form, dated Apr. 7, 2022); R., Vol. IV, at 845–46. For Count One, the jury determined that "[a]t least 50 grams or more" of methamphetamine was attributable to Mr. Woodmore "as a result of his own conduct and the conduct of the other co-conspirators that was reasonably foreseeable to him." R., Vol. I, at 383; R., Vol. IV, at 845.

**5**

In advance of Mr. Woodmore's sentencing, the Probation Office for the Eastern District of Oklahoma ("Probation") prepared a draft presentence investigation report ("PSR"). *See* R., Vol. III, at 91–124 (Draft PSR, prepared Oct. 26, 2022). In calculating Mr. Woodmore's offense level, Probation attributed two separate amounts of methamphetamine to his participation in the conspiracy: first, the "439.9 grams of methamphetamine (actual)" mailed to the Arkansas motel and seized by authorities in August 2019; and second, the "[forty-four] ounces of methamphetamine (mixture)" within the eleven packages sent to the residence of Mr. Woodmore and Ms. Adcock in McAlester, Oklahoma. *See id.* at 108–10 ¶¶ 24, 30,

16

32, 40. Probation calculated the latter figure by relying on Ms. Noel's report that "at a minimum, each package [sent to the McAlester residence] contained 4 ounces of methamphetamine."[8] *Id.* at 109–10 ¶ 30. Therefore, Probation determined that Mr. Woodmore was responsible for forty-four ounces of methamphetamine (mixture): four ounces per each of the eleven packages sent to Mr. Woodmore's home between December 31, 2018, and February 26, 2019. The total converted drug weight attributed to Mr. Woodmore was 11,292.80 kilograms, which corresponded to a base offense level of thirty-four pursuant to the Guidelines. Probation based its calculation on only the drug-distribution conspiracy charge under Count One—and not the money-laundering charges under Counts Nine and Thirteen—because Count One would "result[] in an equal or higher offense level" than Counts Nine and Thirteen. *Id.* at 111 ¶ 39.

Probation then applied a two-level upward adjustment pursuant to U.S.S.G. § 2D1.1(b)(2) based on Mr. Woodmore's alleged use of violence on behalf of the Woodmore organization. With a total offense level of thirty-six and a criminal history category of VI, Probation determined that Mr. Woodmore's sentencing range under the Guidelines was 324 to 405 months of imprisonment.

Mr. Woodmore objected to several components of the PSR. First, he challenged Probation's characterization of his participation in the conspiracy— contained in paragraphs twenty through thirty-two of the PSR—arguing "the

---

[8]     Probation attributed this statement to a post-trial interview with Ms. Noel conducted on June 21, 2021, rather than her testimony at trial.

statements in the PSR grossly exaggerate[d] [his] involvement," and the PSR

"overstate[d] the amount of methamphetamine attributable to [him]." *Id.* at 127

(Def.'s Objs. to PSR, filed Nov. 9, 2022).  Based on this argument, Mr. Woodmore

raised objections to specific factual findings in several paragraphs of the PSR.

Second, he objected to the total amount of drug weight attributed to him because

"there [was] insufficient evidence to establish that he should be held accountable for"

the 439.9 grams of methamphetamine (actual) and forty-four ounces of

methamphetamine (mixture) attributed to him.  *Id.* at 135–36.

Third, Mr. Woodmore objected to the application of the two-level

enhancement for violence under § 2D1.1(b)(2), maintaining that the government

presented insufficient evidence "to establish that [he] was [the Woodmore

organization's] enforcer, or that he ever used violence or threats of violence to

further the alleged conspiracy." *Id.* at 136.  Separately, Mr. Woodmore moved for a

downward adjustment of his base offense level under the role-in-the-offense

provisions of U.S.S.G. § 3B1.2 on the grounds that he was a minimal or minor

participant in the charged conspiracy.[9]

---

[9]    Though Mr. Woodmore styled his motion as one for a "downward departure," it is clear that the relief he was seeking involved a downward *adjustment* in his offense level, which would *set* his final Guidelines range—not a downward *departure from* that Guidelines range.  *See* R., Vol. I, at 429–35 (Def.'s Mot. for Downward Departure, filed May 30, 2023) (arguing that "the Court should apply the downward departure for minimal participants set forth in Section 3B1.2(a), and reduce [Mr.] Woodmore's base offense level by four, or in the alternative reduce his base offense level by either three or two levels under the alternative provisions of Section 3B1.2"); *see, e.g.*, U.S.S.G. § 1B1.1, cmt. n.1(F) (noting that ordinarily "'[d]eparture' means . . . imposition of a sentence outside the applicable guideline

During sentencing, the district court overruled Mr. Woodmore's objections, as well as his request for a role-in-the-offense downward adjustment, pursuant to U.S.S.G. § 3B1.2, and adopted the PSR.  *See* R., Vol. IV, at 857–60 (Sent'g Tr., dated June 8, 2023).  The district court subsequently sentenced Mr. Woodmore to 324 months in prison as to Count One, 240 months in prison as to Counts Nine and Thirteen, and a term of five years of supervised release for Count One and three years of supervised release for Counts Nine and Thirteen.  The sentences for each count would run concurrently.

### 6

The district court entered final judgment on June 16, 2023.  Mr. Woodmore timely filed his notice of appeal on the same day.  We have jurisdiction over his appeal pursuant to 28 U.S.C. § 1291.

### II

Mr. Woodmore raises several challenges to his convictions and sentence on appeal.  First, he argues that the district court erred by failing to properly instruct the jury concerning two separate instructions.  Second, he argues that the district court erred by denying his motion for a judgment of acquittal under Rule 29.  Finally, he

---

range or of a sentence that is otherwise different from the guideline sentence"); *United States v. Darton*, 595 F.3d 1191, 1194 (10th Cir. 2010) (stating that "a departure only exists *apart from* the applicable guideline range; there is no such thing as a departure *to* the applicable guideline range").

argues that the district court erred when calculating his sentence because the district court overruled his objections to the PSR's factual findings.

We address each argument in turn.  Each of Mr. Woodmore's arguments is unavailing.  Accordingly, we decline to disturb the district court's rulings.

## A

We first review Mr. Woodmore's two jury instruction challenges.  First, Mr. Woodmore argues the district court erred by failing to give his requested instruction regarding the definition of "methamphetamine (actual)."  Second, he argues that the district court erred by providing an instruction on the "Right of Attorney to Interview Witnesses."

## 1

"We review the jury instructions de novo and view them in the context of the entire trial to determine if they accurately state the governing law and provide the jury with an accurate understanding of the relevant legal standards and factual issues in the case."  *United States v. Freeman*, 70 F.4th 1265, 1278 (10th Cir. 2023) (quoting *United States v. Thomas*, 749 F.3d 1302, 1312 (10th Cir. 2014)).  "In doing so, we consider whether the district court abused its discretion in 'shaping or phrasing . . . a particular jury instruction' and deciding to give or refuse a particular instruction."  *Id.* (omission in original) (quoting *Thomas*, 749 F.3d at 1312–13).  "A district court abuses its discretion when its decision is 'arbitrary, capricious or whimsical' or falls outside 'the bounds of permissible choice in the circumstances.'"  *United States v. Olea-Monarez*, 908 F.3d 636, 639 (10th Cir. 2018) (quoting *United*

20

*States v. Mares*, 441 F.3d 1152, 1156 (10th Cir. 2006)). "Typically, '[t]he appropriate standard of review for challenges to jury instructions is whether the jury, considering the instructions as a whole, was misled.'" *United States v. Dowlin*, 408 F.3d 647, 664 (10th Cir. 2005) (alteration in original) (quoting *United States v. Smith*, 13 F.3d 1421, 1424 (10th Cir. 1994)).

"[A] trial judge is given substantial latitude and discretion in tailoring and formulating the instructions so long as they are correct statements of law and fairly and adequately cover the issues presented." *United States v. Wood*, 207 F.3d 1222, 1235 (10th Cir. 2000) (quoting *United States v. Pack*, 773 F.2d 261, 267 (10th Cir. 1985)). "We do not require a district court to give another instruction 'if it would simply give the jury a clearer understanding of the issues.'" *United States v. Murry*, 31 F.4th 1274, 1293 (10th Cir. 2022) (quoting *United States v. Williamson*, 746 F.3d 987, 990 (10th Cir. 2014)). "The instructions as a whole need not be flawless, but we must be satisfied that, upon hearing the instructions, the jury understood the issues to be resolved and its duty to resolve them." *United States v. Ransom*, 642 F.3d 1285, 1288 (10th Cir. 2011) (quoting *Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545, 552 (10th Cir.), *cert denied*, 528 U.S. 813 (1999)). If we determine that the district court erred in instructing the jury, "instructional errors are subject to harmless error review." *United States v. Benvie*, 18 F.4th 665, 670 (10th Cir. 2021).

**2**

**a**

Mr. Woodmore argues that the district court erred in denying his request to instruct the jury on a definition for "methamphetamine (actual)" because the absence of such an instruction rendered the jury's finding "inherently unreliable and severely prejudiced [his] right to a fair trial." Aplt.'s Opening Br. at 11–12. He grounds his argument in the language of the Indictment: Count One charged Mr. Woodmore with participating in a conspiracy to knowingly and intentionally "distribute 50 grams or more of methamphetamine (actual)" in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A). *Id.* at 15 (quoting R., Vol. I, at 26). Because § 841(b)(1)(A)(viii) carries a mandatory-minimum sentence of ten years for a violation of the statute involving at least 50 grams of pure methamphetamine or at least 500 grams of a mixture containing methamphetamine, Mr. Woodmore contends that the heightened sentencing stakes required the jury to be instructed precisely on the difference between a mixture of methamphetamine and pure methamphetamine—that is, methamphetamine (actual). In support, Mr. Woodmore cites *United States v. Villegas*, 554 F.3d 894 (10th Cir. 2009), which he asserts "explained the mechanics of how [§] 841's quantity requirements should be applied in a similar fashion." Aplt.'s Opening Br. at 16. As we discuss further *infra*, in *Villegas*, we held that the court did not commit reversible error in charging the jury with the following instruction: "'Pure' or 'actual' methamphetamine refers not only to a particular form of methamphetamine but rather to relative purity of any methamphetamine

22

compound." 554 F.3d at 900 (quotation and citation omitted). More specifically, we reasoned that the issue was "intuitively clear, so it is unlikely that the instruction's terminology would confuse a jury." *Id.* at 902.

According to Mr. Woodmore, instructing the jury on the "proper manner to calculate the actual methamphetamine" attributable to him was particularly imperative here "because of the lack of evidence connecting [him] to any specific quantity of methamphetamine that was actually tested for purity." Aplt.'s Opening Br. at 17. He maintains that none of the shipments connected to him were tested for purity, and "[t]he government's attempt to tie [him] to" the 439.9 grams of pure methamphetamine sent by Ms. Noel while he was incarcerated "was based solely on a vague phone call." *Id.* Therefore, as he reasons, "it is impossible to determine how the jury determined the amount of actual methamphetamine attributable to [him]." *Id.* at 18.

The government responds that "[w]hen providing instructions to a jury, a district court need not 'define a statutory term or phrase that carries its natural meaning.'" Aplee.'s Resp. Br. at 18 (quoting *United States v. Robinson*, 435 F.3d 1244, 1249 (10th Cir. 2006)). It contends that "'[m]ethamphetamine (actual)' is a term that carries its natural meaning," so we should conclude that the district court did not abuse its discretion in denying Mr. Woodmore's requested definitional instruction. *Id.*

The government also emphasizes that, in *Villegas*, we "[did] not recommend the instruction"; we simply did not find reversible error. *Id.* at 19 (alteration in

23

original).  It then reasons that the question of pure methamphetamine weight attributable to Mr. Woodmore was straightforward because "the word 'actual' modifies the word 'methamphetamine'" such that the jury would have understood that "methamphetamine (actual) means the amount of pure methamphetamine that was the object of the conspiracy." *Id.* at 20.  Emphasizing that the jury heard evidence as to the respective weights and purities of different shipments of methamphetamine, the government argues that the instruction would not have confused the jury.

**b**

We conclude that the district court did not abuse its discretion when it declined to include Mr. Woodmore's definition for "methamphetamine (actual)" in the jury instructions.  At issue is whether the jury was properly instructed on how to calculate the amount of "methamphetamine (actual)"—that is, pure methamphetamine— attributable to Mr. Woodmore.  By way of background, as Mr. Woodmore recognized by the authority he cited in support of his proposed definitional instruction, *see* R., Vol. I, at 341, the term "methamphetamine (actual)" is drawn from the Guidelines, which state that the term "refer[s] to the weight of the controlled substance, itself, contained in the mixture or substance."  U.S.S.G. § 2D1.1(c) & n.B (Notes to Drug Quantity Table).  The Guidelines simply use the term "methamphetamine" to refer to "any mixture or substance containing *a detectable amount* of the controlled substance," methamphetamine.  *Id.* § 2D1.1(c) & n.A (emphasis added).  Consistent with this definitional approach, we have previously described "methamphetamine

24

(actual)" as "the actual weight of the pure d-methamphetamine hydrochloride in a mixture." *United States v. Verdin-Garcia*, 516 F.3d 884, 896 (10th Cir. 2008). Accordingly, the relevant question here is whether a reasonable juror would have understood that the term "methamphetamine (actual)" in the court's instructions meant "pure" methamphetamine—without need of any clarification from Mr. Woodmore's proffered definitional instruction for "methamphetamine (actual)." We conclude that a reasonable juror would have had this understanding.

First, by virtue of the evidence presented at trial, the jury would not have been confused about whether "methamphetamine (actual)" meant pure methamphetamine. In multiple instances at trial, the government asked witnesses to differentiate between gross methamphetamine (i.e., a mixture containing methamphetamine) and the pure-form methamphetamine found within the gross methamphetamine. For example, after eliciting from a DEA agent that Early sold 55.7 grams of methamphetamine to a confidential source in November 2018, the government asked the agent, "[h]ow much pure substance was it?"—to which the agent replied, "98 percent pure plus or minus four percent," with a corresponding purity weight of "54.5 grams." R., Vol. IV, at 53–54. Similarly, the government presented testimony that connected Mr. Woodmore to "444.4 gross grams" of methamphetamine sent by Ms. Noel to the Arkansas motel. *Id.* at 747; *see id.* at 772–75, 784; Suppl. R., Vol. II, Ex. 71, Ex. 72. For this shipment, the government once again questioned a DEA agent about the methamphetamine's purity, asking "[w]ere they able to tell the purity weight of the substance?"—to which the agent responded that the seized methamphetamine had a

25

pure substance weight of "439.9 gross grams, which is approximately one pound," with a purity level of "99 percent." R., Vol. IV, at 747–48.[10]

This evidence strongly suggests that, in the context of this case, a reasonable juror would have understood the "intuitively clear," *Villegas*, 554 F.3d at 902, distinction between pure methamphetamine and mixed methamphetamine, given that the government adduced evidence of the purity rates and purity weights of multiple samples of seized methamphetamine connected to the Woodmore organization. As a result, when presented with an instruction that included the term "methamphetamine (actual)," a reasonable juror would have understood that this term corresponded to pure methamphetamine—and, more specifically, would have reached this conclusion without the aid of a definition for "methamphetamine (actual)." Therefore, providing a definitional instruction was unnecessary. *See Ransom*, 642 F.3d at 1288 ("[W]e must be satisfied that, upon hearing the instructions, the jury understood the issues to be resolved and its duty to resolve them." (quoting *Medlock*, 164 F.3d at 552)).

---

[10] Mr. Woodmore argues that, based on the challenged instruction, "it is impossible to determine how the jury determined the amount of actual methamphetamine attributable to Woodmore." Aplt.'s Opening Br. at 18. But the government connected Mr. Woodmore to the 439.9 grams of pure methamphetamine shipped by Ms. Noel based on calls Mr. Woodmore made to his wife, Ms. Adcock, as the methamphetamine was en route. *See id.* at 772–75, 784; Suppl. R., Vol. II, Ex. 71, Ex. 72. The jury could have reasonably concluded that this transaction, standing alone, established that 50 grams or more of methamphetamine (actual) was attributable to Mr. Woodmore. *See* R., Vol. I., at 383. Although Mr. Woodmore maintains that tying him to this shipment "was based solely on a vague phone call," Aplt.'s Opening Br. at 17, on appeal we "do[] not . . . reweigh the evidence." *See United States v. Johnson*, 821 F.3d 1194, 1201 (10th Cir. 2016). Accordingly, we find this contention unpersuasive.

In *United States v. Robinson*, 435 F.3d 1244 (10th Cir. 2006), we cited a series of cases from our sister circuits that "establish[ed] the proposition that '[a] district court need not define a term when its use in jury instructions comports with its ordinary meaning.'" *Id.* at 1249–50 (second alteration in original) (quoting *Miller v. Neathery*, 52 F.3d 634, 638 (7th Cir. 1995)). We have since endorsed our logic from *Robinson* when considering non-technical, commonplace terms that appear without a definition in jury instructions. *See, e.g.*, *United States v. Schuler*, 458 F.3d 1148, 1156 (10th Cir. 2006) (concluding a district court did not err when it refused to give an instruction on the meaning of the term "guarantee" because "the term itself is not a technical one, and it does not require a specific definition in the instructions in order for the jury to understand its usage in this case"); *Thomas*, 749 F.3d at 1313 (holding the district court did not err by omitting a definition for the word "used" in an instruction "[b]ecause the word is commonplace, [so] the district court could reasonably conclude that a definition was unnecessary"); *Williamson*, 746 F.3d at 991 (holding the word "unlawful" was commonly known and need not be defined in a jury instruction).

The logic from *Robinson* equally applies to instructions like the challenged instruction in this case—where the "ordinary meaning" of a term corresponds to a particular meaning based on the evidence presented at trial. *See Atchison, Topeka & Santa Fe Ry. Co. v. Preston*, 257 F.2d 933, 937 (10th Cir. 1958) ("[A] court is not require[d] to define words and phrases which are familiar to one of ordinary intelligence. *In view of the trend of the trial*, and the substance of the instructions as

27

a whole which appear in the record, we entertain no doubt that the jury had a clear understanding with respect to the meaning of the term . . . as used in the instruction, and that the failure to define such term did not prejudice the defendant." (emphasis added) (citation omitted)); *Freeman*, 70 F.4th at 1278 ("We review the jury instructions . . . *in the context of the entire trial* to determine if they . . . provide the jury with an accurate understanding of the relevant legal standards and factual issues in the case." (emphasis added) (quoting *Thomas*, 749 F.3d at 1312)).

In this case, the term "actual" was used to qualify the term "methamphetamine" in the jury instructions. The ordinary meaning of "actual" (including in 2022 when Mr. Woodmore was tried) is "[e]xisting in fact" or "real." *Actual*, BLACK'S LAW DICTIONARY (11th ed. 2019); *see also Actual*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/actual (last updated Jan. 14, 2025) (defining "actual" as "existing in fact or reality"). Based on the evidence that the government adduced at trial, it would have been clear to the jury that the "actual" methamphetamine of the court's instruction—that is, the "real" methamphetamine or the methamphetamine that "existed in fact,"—was the "pure" methamphetamine that the witnesses testified about.

Furthermore, even if providing a definition of "methamphetamine (actual)" would have enhanced the jury's understanding of the term and better allowed the jury to quantify the amount of methamphetamine attributable to Mr. Woodmore, "[w]e do not require a district court to give another instruction 'if it would simply give the jury a clearer understanding of the issues.'" *Murry*, 31 F.4th at 1293 (quoting

28

*Williamson*, 746 F.3d at 990). Rather, we are tasked with determining whether "the jury understood the issues to be resolved and its duty to resolve them." *Ransom*, 642 F.3d at 1288 (quoting *Medlock*, 164 F.3d at 552); *see also id.* ("The instructions as a whole need not be flawless[.]"). And in this case, from the government's evidence, the jury understood that "methamphetamine (actual)" corresponded to pure methamphetamine and further understood that it must consider in its calculations this, and only this, form of methamphetamine in determining whether Mr. Woodmore was guilty beyond a reasonable doubt of conspiring to distribute methamphetamine, as the Indictment charged. Therefore, it cannot be said that the district court abused its discretion by failing to deliver Mr. Woodmore's proposed definitional instruction concerning "methamphetamine (actual)." And the mere possibility that such a definitional instruction would have appreciably aided the jury's job here is—as a matter of law—of no consequence.

Recall that Mr. Woodmore relies on our *Villegas* case for support. But, for reasons that we explicate, that reliance is misplaced. There, the instruction that the defendant unsuccessfully challenged read, as we previously noted, as follows: "'Pure' or 'actual' methamphetamine refers not only to a particular form of methamphetamine but rather to relative purity of any methamphetamine compound." 554 F.3d at 900 (quotation omitted). Far from endorsing this instruction, we observed that it was "not obvious to us that [the] use of the terms *pure methamphetamine* and *actual methamphetamine* is an improvement over using simply the term *methamphetamine*, and we do not recommend the instruction in this case."

29

*Id.* at 902. Nevertheless, we determined that the district court's use of the instruction was not reversible error because the issue was "intuitively clear, so it is unlikely that the instruction's terminology would confuse a jury"—especially given that the jury heard testimony from an expert witness as to the calculation of methamphetamine purity. *Id.*

We consider it patent that *Villegas* does not avail Mr. Woodmore; indeed, it cuts against him. Specifically, *Villegas* displayed a skepticism regarding the necessity for definitional instructions that attempt to elaborate on the distinction between pure methamphetamine and mixtures that contain methamphetamine because this distinction is "intuitively clear." 554 F.3d at 902. Therefore, in the context of a set of instructions, as here, that already does more than *Villegas* considered to be "obvious[ly]" necessary, 554 F.3d at 902, by qualifying the plain term "methamphetamine" with the adjective "actual"—it seems virtually certain that *Villegas* would not counsel doing more by adding to the instructions a definition of "methamphetamine (actual)," much less determine that the court abused its discretion by not adding such a definition. Therefore, Mr. Woodmore's reliance on *Villegas* is misplaced. And, problematically for him, that is the only authority that Mr. Woodmore has to offer. *See Williamson*, 746 F.3d at 991 (noting, in a denial of a defendant's challenge to a jury instruction, that the "[d]efendant cites no authority requiring it to be defined or defining it as he proposes").

30

Accordingly, we conclude that the district court did not abuse its discretion by refusing to charge the jury with Mr. Woodmore's proposed definitional instruction for the term "methamphetamine (actual)."

**3**

**a**

Mr. Woodmore next challenges the district court's instruction on the "Right of Attorney to Interview Witnesses." Recall that the challenged instruction read:

**RIGHT OF ATTORNEY TO INTERVIEW WITNESSES**

> An attorney may have the right to interview witnesses for the purpose of learning the testimony those witnesses will give. The fact that a witness has talked to an attorney and told the attorney what he or she would testify to does not, by itself, reflect adversely on the truth of the testimony of the witness.

R., Vol. I, at 357. Mr. Woodmore argues that the instruction "misstates the law because it incorrectly instructs the jury that [his] counsel also had the right to interview the witnesses presented against [him], when that was not the case." Aplt.'s Opening Br. at 21. Specifically, he contends that his counsel did not have the "right" to speak with the government's witnesses because "[t]here was nothing to prevent the witnesses from declining to talk to [defense] counsel." *Id.* Further, he reasons that "it would have been unethical for [defense] counsel to contact [the witnesses] directly for an interview" because the witnesses were represented by their own counsel. *Id.* at 23. As such, he contends that the instruction's implication that defense counsel had a right to interview government witnesses "is completely divorced from reality." *Id.*

In Mr. Woodmore's view, the district court's instruction was "particularly prejudicial" here because many of the witnesses who testified against him were originally co-defendants who then chose to cooperate with the government—and were thus required to testify under their cooperation agreements. *Id.* at 22. Additionally, he argues that the instruction was "improper" because it contrasts with other "credibility instructions, which direct the jury that they may, but are not required, to consider certain actions when determining the credibility of the witness." *Id.* at 23 (emphasis omitted).

The government characterizes Mr. Woodmore's argument as "hyper-technical" and contends that he "misses the point of the court's instruction," which was to "instruct the jury that it is not improper for an attorney to interview a witness before trial." Aplee.'s Resp. Br. at 22. The government explains that, if the district court had not given the instruction, the jury could have come away with the "false impression that [the government's act of] talking to witnesses before trial about their testimony was wrong." *Id.* at 23. Rebutting Mr. Woodmore's assertion that the instruction misstated the law, the government points out that we affirmed "a nearly identical instruction to the one given here" in *United States v. John*, 849 F.3d 912 (10th Cir. 2017). Aplee.'s Resp. Br. at 22. Finally, the government contends that the instruction did not "prevent defense counsel from making a commonsense suggestion that the witness[es] [were] influenced by inappropriate coaching"—which Mr. Woodmore's counsel was free to make here. *Id.* at 23 (alterations in original) (quoting *John*, 849 F.3d at 920).

32

**b**

We conclude that the district court did not abuse its discretion by delivering the "Right of Attorney to Interview Witnesses" jury instruction.

**i**

Chiefly, Mr. Woodmore's challenge cannot escape our prior holding in *United States v. John*, 849 F.3d 912 (10th Cir. 2017). In *John*, the defendant contested an instruction that, in all material respects, is very similar to the one in this case, arguing that the instruction "insulated from the jury's scrutiny the cross-examination of the victim about being improperly influenced by the prosecutor." *Id.* at 919.[11] We noted in *John* that this challenge was one of several that the defendant made to "instructions on how to assess evidence"—that is, instructions that are "directed to guiding the jurors' common sense in the context of the case rather than informing them of the governing law." *Id.* at 918. And because such instructions performed this guidance function (rather than a law-dispensing function), we observed that decisions regarding whether to give them "are particularly matters of trial-court discretion." *Id.*

In full, the challenged instruction in *John* read:

> An attorney has the right to interview a witness for the purpose of learning what testimony the witness will give. The fact that a

---

[11] At issue in *John* were questions on cross-examination posed by defense counsel to the victim—a government witness—suggesting that the witness's testimony was unreliable because she was coached by the government in advance of trial. 849 F.3d at 919.

> witness has talked to an attorney does not reflect adversely on the
> truth of such testimony.

*Id.* at 919 (quotation and citation omitted).  Finding the defendant's challenge to this instruction to be without merit, we first noted that the instruction "does not misstate the law."  *Id.* at 920.  And from a commonsense perspective, it is easy to understand why this is so.  Courts have repeatedly found that there is nothing improper about attorneys preparing witnesses in anticipation of trial.  *See, e.g.*, *United States v. Ash*, 413 U.S. 300, 318 (1973) ("[T]he interviewing of witnesses before trial is a procedure that predates the Sixth Amendment.  In England in the 16th and 17th centuries counsel regularly interviewed witnesses before trial.  The traditional counterbalance in the American adversary system for these interviews arises from the equal ability of defense counsel to seek and interview witnesses himself." (citation omitted)); *United States v. Torres*, 809 F.2d 429, 439–40 (7th Cir. 1987) ("[I]t is perfectly proper for a lawyer to interview a witness in preparation for trial, and an attorney who does not question, rehearse and prepare his witnesses before trial is not properly prepared for trial."[12] (internal quotation marks omitted)).

Thus, an attorney certainly has the right to *ask* a witness to submit to an interview so that the attorney can learn the nature of the witness's testimony; it is then, of course, the witness's prerogative *whether to consent* to such an interview.

---

[12]    The Seventh Circuit's pattern criminal jury instructions include the following instruction: "It is proper for an attorney to interview any witness in preparation for trial."  *The William J. Bauer Pattern Criminal Jury Instructions of the Seventh Circuit* § 3.02 (2023 ed.).

*See United States v. Carrigan*, 804 F.2d 599, 603 (10th Cir. 1986) ("We have recognized the principle that witnesses in a criminal prosecution belong to no one, and that, *subject to the witness'[s] right to refuse to be interviewed*, both sides have the right to interview witnesses before trial." (emphasis added)).  For example, a witness may consent to a pre-trial interview formally through antecedent written promises in a cooperation agreement with the government or, on an ad hoc basis, when approached by an attorney.  We do not read the first sentence of the *John* instruction as standing for anything more than the sensible proposition that attorneys can *ask* witnesses to interview before trial and those witnesses may consent—or not—to participate in the requested interviews.

To be sure, the language that the district court used in *John*—and that we upheld on appeal—suffered from a lack of precision and could conceivably have been read to suggest that attorneys had a *right* to interview witnesses—irrespective of whether they consented to be interviewed or not.  However, the *John* panel no doubt recognized that "we must endeavor to interpret our cases in a manner that permits them to coexist harmoniously."  *United States v. Mier-Garces*, 967 F.3d 1003, 1018 (10th Cir. 2020) (quoting *United States v. Hansen*, 929 F.3d 1238, 1254 (10th Cir. 2019)); *accord United States v. Murphy*, 100 F.4th 1184, 1210 n.20 (10th Cir. 2024).  And under our precedent, an instruction that reflected such an absolutist understanding of attorneys' interview authority would have been erroneous—that is, it would have been an *in*accurate statement of the law.  *See Carrigan*, 804 F.2d at 603.  Accordingly, when we concluded in *John* that the district court's instruction did

not "misstate the law," we necessarily must have rejected such an absolutist reading and instead concluded that a reasonable juror would not interpret the instruction that way. Indeed, we do not believe such a reading is the natural import of the language. Instead, as noted, we read the first sentence of the *John* instruction as standing for the sensible proposition that attorneys can *ask* witnesses to interview before trial and those witnesses may consent—or not—to participate in the requested interviews.

In addition, in *John* we rejected the defendant's contention regarding the preclusive effect of the instruction on the defendant's ability to cross-examine the government's witnesses. 849 F.3d at 920. In particular, we rebuffed the defendant's argument that "the instruction suggests that nothing improper could possibly occur in such discussions." *Id.* In that regard, we stated the following: "[T]hat is not what [the instruction] says. And [the instruction] does not prevent defense counsel from making a commonsense suggestion that the witness was influenced by inappropriate coaching. In fact, counsel did so in th[e] case [at bar], both during cross-examination and during closing argument." *Id.* Accordingly, we concluded that the argument that the instruction barred such a line of attack was meritless. *Id.*

In light of the reasoning and outcome in *John*, we reject Mr. Woodmore's challenge to the instruction at issue here. The district court's instruction was very similar in all material respects to the one that we upheld in *John*; accordingly, we see no basis for concluding that the instruction here misstated the law. Instead, we are obliged to adhere to *John*'s holding and reasoning, so we uphold the validity of the district court's instruction. *See United States v. Brooks*, 751 F.3d 1204, 1209 (10th

36

Cir. 2014) ("Absent *en banc* consideration, we generally 'cannot overturn the decision of another panel of this court.'" (quoting *United States v. Meyers,* 200 F.3d 715, 720 (10th Cir. 2000)).

Indeed, the district court's small, but significant, modification of the instruction in response to Mr. Woodmore's objection—which made the instruction speak in less absolutist terms, so as to indicate that "an attorney *may* have the right" to interview witnesses, *see* R., Vol. IV, at 812–13 (emphasis added); R., Vol. I, at 357—actually caused the plain terms of the instruction to more clearly express the legally correct proposition that we have shown that *John*'s language in fact stands for.[13]  *See United States v. Eubanks*, No. 24-7005, 2024 WL 3874181, at *3 (10th

---

[13]    To avoid any conceivable misunderstanding that might stem from the imprecise language of the district court's instruction in *John*, going forward, courts should consider crafting the first sentence of the instruction along the following lines: "Attorneys have the right to ask witnesses for interviews prior to trial for the purpose of learning the testimony those witnesses will give, but witnesses are not required to submit to such interviews," or, alternatively, that "it is proper for an attorney to interview a witness in preparation for trial."  A panel of our court recently affirmed a district court's delivery of the latter instruction in *United States v. Eubanks*, No. 24-7005, 2024 WL 3874181, at *2–4 (10th Cir. Aug. 20, 2024) (unpublished).  And, though not bound by it, we think the reasoning in *Eubanks* is persuasive.  *See, e.g.*, *United States v. Engles*, 779 F.3d 1161, 1162 n.1 (10th Cir. 2015).  Such language would more closely align with our precedent and minimize any conceivable prospect of juror misunderstanding.  *See United States v. Carrigan*, 804 F.2d 599, 603 (10th Cir. 1986) ("We have recognized the principle that witnesses in a criminal prosecution belong to no one, and that, subject to the witness' right to refuse to be interviewed, both sides have the right to interview witnesses before trial."); *see also United States v. Ransom*, 642 F.3d 1285, 1288 (10th Cir. 2011) ("The instructions as a whole need not be flawless, but we must be satisfied that, upon hearing the instructions, the jury understood the issues to be resolved and its duty to resolve them." (quoting *Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545, 552 (10th Cir.), *cert denied*, 528 U.S. 813 (1999))).

Cir. Aug. 20, 2024) (unpublished) ("Although the challenged attorney-interview jury instruction here and the jury instruction in *John* are not identical, the differences weigh in favor of affirming the district court's ruling.").[14]  Therefore, it is patent to us that *John* is controlling, and guided by its holding and reasoning, we must uphold the district court's use of the instruction here.

**ii**

Moreover, even if *John* did not so squarely dictate the outcome here, we would reject as misguided Mr. Woodmore's arguments regarding the prejudicial effects of the instruction.  He argues that "the instruction seeks to explain away a potential source of bias . . . by telling the jury that all attorneys have a right to interview witnesses."  Aplt.'s Opening Br. at 22.  The erroneous message to the jury that Mr. Woodmore presumably posits that the challenged instruction sends is that witnesses who meet with an attorney do not do so consensually but, rather, are legally compelled to do so in response to the attorney's "right" to interview them.  Furthermore, Mr. Woodmore contends that the instruction "downplay[s] the potential bias these cooperating witnesses may have to provide testimony that favors the government's case."  *Id.* at 23.

These arguments miss the mark: they proceed from a false, absolutist reading of the instruction.  As we have stated, the natural reading of this instruction is that

---

[14]    As we have noted *supra* note 13, we rely on unpublished cases for their persuasive value and do not treat them as binding precedent.  *See Engles*, 779 F.3d at 1162 n.1.

attorneys have a right to *ask* witnesses to meet with them to discuss their trial testimony, but those witnesses may decline the interviews.  Likewise, the district court's use of the term "may" in its modified instruction suggested the nonobligatory nature of these interviews.  *See* R., Vol. I, at 357.  Accordingly, we reject Mr. Woodmore's contention that the instruction had the effect of explaining away any bias resulting from witnesses meeting with attorneys or downplaying any potential for bias that witnesses may have from meeting with the government regarding their testimony.  And critically, as we observed in *John*, nothing in the instruction's terms prevented the defense from attacking the motivation or credibility of witnesses for meeting with the government.[15]  849 F.3d at 920.

Furthermore, when reviewing jury instruction challenges, we ordinarily read the challenged instruction in the context of the entire instructions.  *See Dowlin*, 408 F.3d at 664 ("Typically, '[t]he appropriate standard of review for challenges to jury instructions is whether the jury, considering the instructions *as a whole*, was misled.'" (alteration in original) (emphasis added) (quoting *Smith*, 13 F.3d at 1424)).  Elsewhere in the jury instructions in this case—specifically, in a section entitled "Credibility of Witnesses"—the jury was instructed: "You are the sole judges of the credibility or 'believability' of each witness and the weight to be given to the witnesses' testimony."  R., Vol. I, at 349.  This instruction, when viewed in tandem

---

[15]    In fact, the government's trial witnesses Ms. Miller and Mr. Marshall—both of whom met with the government prior to trial—were questioned to this effect by counsel for Early Woodmore and Calvin Woodmore, respectively.  *See* R., Vol. IV, at 338–39, 648.

with the challenged instruction, would have undercut any suggestion in the minds of reasonable jurors that they could not consider the bias or lack of credibility of witnesses that might be associated with the witnesses meeting with the government to discuss their testimony.

\*\*\*

In sum, we conclude that the district court did not abuse its discretion by delivering the "Right of Attorney to Interview Witnesses" instruction.

**B**

We next review Mr. Woodmore's Rule 29 challenge. Mr. Woodmore contends that the district court erred by denying his motion for a judgment of acquittal for Count Nine (Money Laundering Conspiracy) and Count Thirteen (Money Laundering).

**1**

"We review de novo a district court's decision to deny a defendant's motion for acquittal under Rule 29." *Murphy*, 100 F.4th at 1195. "We must view the evidence, both direct and circumstantial, in the light most favorable to the government, and without weighing conflicting evidence or considering the credibility of witnesses, determine whether that evidence, if believed, would establish each element of the crime." *Id.* at 1196 (quoting *United States v. Fuller*, 751 F.3d 1150, 1153 (10th Cir. 2014)). "Our review is very deferential; we will not overturn a jury's verdict unless no reasonable juror could have concluded, on the basis of the evidence presented, that the defendant was guilty of the crime charged." *United States v.*

*Gabaldon*, 389 F.3d 1090, 1094 (10th Cir. 2004); *see United States v. Walker*, 74 F.4th 1163, 1190 (10th Cir. 2023) ("[W]e will reverse the conviction only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (alteration in original) (quoting *United States v. Burtrum*, 21 F.4th 680, 686 (10th Cir. 2021))). "[A]nd the fact that prosecution and defense witnesses presented conflicting or differing accounts at trial does not necessarily render the evidence insufficient." *United States v. Porter*, 745 F.3d 1035, 1050 (10th Cir. 2014) (quoting *United States v. Cooper*, 654 F.3d 1104, 1115 (10th Cir. 2011)).

"While the evidence supporting the conviction must be substantial and do more than raise a mere suspicion of guilt, it need not conclusively exclude every other reasonable hypothesis and it need not negate all possibilities except guilt." *United States v. Erickson*, 561 F.3d 1150, 1158–59 (10th Cir. 2009) (quoting *United States v. Burkley*, 513 F.3d 1183, 1188 (10th Cir. 2008)). But we cannot uphold a conviction "that was obtained by nothing more than piling inference upon inference . . . or where the evidence raises no more than a mere suspicion of guilt." *Walker*, 74 F.4th at 1190 (omission in original) (quoting *United States v. Rufai*, 732 F.3d 1175, 1188 (10th Cir. 2013)).

Finally, where, as here, the defendant did not put on an affirmative evidentiary case of his own, "our review of the record is necessarily limited to evidence produced during the [g]overnment's case-in-chief alone." *United States v. Delgado-Uribe*, 363 F.3d 1077, 1082 (10th Cir. 2004).

41

**2**

To prove money laundering under § 1956(a)(1)(A)(i), the government must establish that "(1) the defendant conducted or attempted to conduct a financial transaction (2) which the defendant knew involved the proceeds of unlawful activity (3) with the intent to promote or further the unlawful activity." *United States v. Johnson*, 821 F.3d 1194, 1203 (10th Cir. 2016).[16] Similarly, "[t]o prove a money laundering conspiracy, the evidence must establish (1) an agreement with another to knowingly conduct a financial transaction involving the proceeds of a specified unlawful activity with the intent to further the specified unlawful activity; (2) knowledge of the essential objectives of the conspiracy; (3) knowing and voluntary involvement; and (4) interdependence among the alleged conspirators." *United States v. Renteria*, 720 F.3d 1245, 1254 (10th Cir. 2013). "[C]onviction for conspiracy to commit money laundering . . . does not require proof of an overt act in furtherance of the conspiracy." *Whitfield v. United States*, 543 U.S. 209, 219 (2005). Instead, all that is required is "[a]greeing to obtain illegal proceeds and to launder

---

[16]    In this case, since the specified "unlawful activity" was "distribution of a controlled substance," the government was also required to prove that "[t]he financial transaction or attempted financial transaction involved the proceeds of the distribution of a controlled substance." R., Vol. I., at 370; *see* 18 U.S.C. § 1956(c)(7) (specifying "distribution of a controlled substance" as a "specified unlawful activity" for purposes of § 1956(a)(1)(A)(i)); *United States v. Garcia*, 99 F.4th 253, 261 (5th Cir. 2024) ("Here, the indicted 'specified unlawful activity' was 'the distribution of a controlled substance.'").

those proceeds." *United States v. Wittig*, 575 F.3d 1085, 1103 (10th Cir. 2009) (emphasis omitted).

For a conspiracy charge, the jury can infer an agreement between parties based solely on circumstantial evidence demonstrating that the parties took concerted action in furtherance of a shared objective. *See United States v. Gallegos*, 784 F.3d 1356, 1360–61 (10th Cir. 2015); *United States v. Torres*, 53 F.3d 1129, 1135 (10th Cir. 1995) ("[T]he absence of any direct evidence of a conspiracy is immaterial so long as there is sufficient circumstantial evidence of a conspiracy to support a finding of guilt beyond a reasonable doubt."). But "an inference is only reasonable where there exists a 'probability that the conclusion flows from the proven facts.'" *United States v. Rahseparian*, 231 F.3d 1257, 1262 (10th Cir. 2000) (quoting *United States v. Jones*, 44 F.3d 860, 865 (10th Cir. 1995)).

**3**

Mr. Woodmore largely presents the same sufficiency arguments in challenging his convictions relating to the separate counts—that is, Counts Nine and Thirteen.[17] However, briefly focusing on his conviction for money laundering conspiracy in Count Nine, Mr. Woodmore asserts that his attempted transfer of $2,000 was "[t]he only evidence related to [his] alleged involvement in the alleged money laundering

---

[17]    In his opening brief, Mr. Woodmore erroneously transposes Counts Nine and Thirteen with one another when explaining the elements for each count. The government notices this mistake and addresses his arguments as if he correctly matched each count to the appropriate legal standard. We too ignore the mistake and address Mr. Woodmore's arguments as if he had correctly identified each count.

conspiracy." Aplt.'s Opening Br. at 27. According to Mr. Woodmore, "because there was no evidence that this transaction was part of a scheme to launder money, there [was] insufficient evidence to support the money laundering conspiracy charge against [him]." *Id.* at 27–28.

Otherwise, Mr. Woodmore seemingly raises the same arguments as to both counts. He primarily argues that "[t]he government did not produce any evidence that the $2,000 wired by [Mr.] Woodmore was actually drug proceeds." *Id.* at 28. Mr. Woodmore first reasons that he had a legitimate source of income aside from the Woodmore organization's drug activities such that "it would be improper to conclude that any funds in his possession were necessarily drug proceeds." *Id.* at 28. In support, he points to Ms. Needham's testimony that Early had a horse-related business to which Mr. Woodmore contributed. *Id.*

Mr. Woodmore also argues that "the only evidence regarding the purpose of the wire transfer was the testimony of [Ms.] Noel, who testified that the $2,000 wire transfer could have been for merchandise." *Id.* He highlights Ms. Noel's testimony in which she could not recall if the attempted $2,000 transaction was for methamphetamine, and he contrasts this testimony with Ms. Noel's ability to recall that "other transactions were definitely for the purchase of methamphetamine." *Id.* at 29 (citing R., Vol. IV, at 230–31).

In Mr. Woodmore's view, due to this purported "lack of evidence, the jury was required to speculate as to both the nature of the funds wired by [him] and the purpose for which the wire transfer was to be used." *Id.* at 29. He reasons that such

44

speculation necessarily involved "piling inference upon inference" without sufficient supporting evidence. *Id.* (quoting *United States v. Valadez-Gallegos*, 162 F.3d 1256, 1262 (10th Cir. 1998)).  Mr. Woodmore then summarizes that "[t]he mere fact that [he] wired $2,000 to Ms. Noel is not sufficient evidence to establish that the money was illegal proceeds or that it was sent to Ms. Noel for the purpose of promoting illegal activity." *Id.* at 30.

In response, the government offers separate rebuttals for Counts Nine and Thirteen.  For Count Nine, the government explains that at trial, it presented "substantial evidence of the members of the Woodmore [organization] acting in concert to launder money by sending drug proceeds to [Ms.] Noel."  Aplee.'s Resp. Br. at 29.  The government then states that Mr. Woodmore's "own actions . . . 'furthered the objectives of the conspiracy'" because he attempted to wire the $2,000 via MoneyGram, which Ms. Miller testified was one of the platforms that Early used to wire Ms. Noel her share of the methamphetamine proceeds. *Id.* at 29–30 (quoting *United States v. Banks*, 884 F.3d 998, 1020 (10th Cir. 2018)).  The government also points to testimony that Ms. Noel "only spoke with Early—and later, after Early went to jail, with Amber—about the purchase of methamphetamine and wiring money" and that Ms. Noel "would have had a conversation with Early about sending the $2,000 before it was sent" to argue that "the reasonable inference" is that Mr. Woodmore attempted to send the $2,000 at Early's request, reflecting "participation in the conspiracy to launder money." *Id.* at 30.

For Count Thirteen, the government points to testimony from Ms. Needham that "[Mr.] Woodmore did not have a job" during the time that she was associated with the Woodmore organization, and that "the Money[G]ram spreadsheet that was introduced at trial listed [Mr.] Woodmore's occupation as 'retire[d].'" *Id.* at 25–26 (quoting R., Suppl. Vol. I, at 4). The government then cites evidence from trial that "Early did not make much money from the horse business." *Id.* at 26 (citing R., Vol. IV, at 340). Finally, in response to Mr. Woodmore's argument that the $2,000 at issue could have been for merchandise, the government contends that "the [government] presented evidence . . . that all of the money sent to [Ms.] Noel . . . was to promote the [Woodmore organization's] drug trafficking activities" and that "[a]n integral part of this operation was funneling money back to [Ms.] Noel." *Id.* at 26–27. Additionally, the government explains that Early's merchandise arrangement with Ms. Noel reflected that the Woodmore organization "was willing to send [Ms.] Noel extra money, including thousands of dollars for goods that [Ms.] Noel had obtained for next to nothing, in order to maintain its access to the methamphetamine [Ms.] Noel supplied, thus promoting their ongoing drug trafficking activity." *Id.* at 28.

**4**

We conclude that the government presented sufficient evidence at trial to support Mr. Woodmore's convictions on Counts Nine and Thirteen. In reaching this conclusion, we must determine whether a reasonable juror could have drawn inferences from Mr. Woodmore's attempted $2,000 wire transfer to Mr. Austin, Ms.

46

Noel's brother, that would support verdicts of guilt. And we conclude that, given the totality of the evidence presented at trial, a reasonable juror could conclude that Mr. Woodmore attempted to send the $2,000—which he knew were proceeds of the Woodmore organization's methamphetamine-trafficking enterprise—with the intent to further the unlawful activities of that organization. We reach this finding after reviewing three independent, but interlinked, lines of evidence presented at trial in the light most favorable to the government. *See Murphy*, 100 F.4th at 1196. Perhaps one or more of these lines of evidence, standing alone, would have been sufficient for a reasonable juror to render verdicts of guilt against Mr. Woodmore on the money laundering and money laundering conspiracy counts. But we need not opine on that matter. Suffice it to say that we conclude that, in combination, these three lines of evidence provided legally sufficient evidence of Mr. Woodmore's guilt as to those two counts. *See Johnson*, 821 F.3d at 1203; *Renteria*, 720 F.3d at 1254.

First, the government established at trial that Mr. Woodmore played a substantial role in the Woodmore organization's illicit activities. For example, Ms. Miller testified that when someone owed Early drug debts, Early "would send [Mr. Woodmore]" to collect the debts. R., Vol. IV, at 310–11. She also personally observed Mr. Woodmore handling methamphetamine "a few times" and breaking down the methamphetamine packages shipped by Ms. Noel into smaller quantities. *Id.* at 311, 315. Moreover, multiple witnesses, including Mr. Marshall and Ms. Davis, testified that they had previously purchased methamphetamine directly from Mr. Woodmore. Mr. Marshall also recounted that Mr. Woodmore instructed him to

47

"get with" Early after his release from jail to discuss trafficking methamphetamine. *Id.* at 600–01.

Mr. Woodmore also took part in the assault on Mr. Eaton because the Woodmore organization believed that Mr. Eaton stole methamphetamine from the organization. And finally, Mr. Woodmore's residence served as a destination for Ms. Noel's methamphetamine packages. Viewed in its totality, the evidence of Mr. Woodmore's substantial involvement in the Woodmore organization's unlawful activities would have lent material and significant support to a reasonable juror's finding that Mr. Woodmore attempted to wire the $2,000 payment to Ms. Noel's brother with the intent to further the organization's unlawful activities.

Second, the government presented considerable evidence that the methamphetamine-distribution conspiracy and the money laundering conspiracy were inextricably linked. And, from that evidence, there would have been a substantial basis for a reasonable juror to infer that Mr. Woodmore was involved in *both* conspiracies and, relatedly, that his attempted wire of the $2,000 to Ms. Noel's brother was intended to further the unlawful activities of the Woodmore organization. Ms. Needham testified that Early paid Ms. Noel for her share of the drug proceeds by sending her money through wire transfer platforms like MoneyGram and Western Union. Early and Ms. Noel would speak on the phone to coordinate these transfers. Just like Early relied on other members of the Woodmore organization to distribute methamphetamine, Early also relied on other members to wire money to Ms. Noel for her share of the methamphetamine proceeds. Consequently, far from there being

bright lines of demarcation between the Woodmore organization's two conspiracies, they were interdependent, and their activities were inextricably linked.

Because Ms. Noel was flagged by MoneyGram and Western Union for receiving a suspiciously high number of payments, she assigned her family members to receive money on her behalf. Mr. Woodmore sought to wire one of those family members—Mr. Austin, Ms. Noel's brother—$2,000 through MoneyGram, a platform frequently used by Early and other Woodmore organization associates to pay Ms. Noel for her share of the drug proceeds. Ms. Noel later testified that Mr. Woodmore could not have known Mr. Austin personally and that the money was related to Ms. Noel's business with the Woodmore organization.

Therefore, a reasonable juror would have had a substantial basis for inferring that the money laundering and methamphetamine-trafficking conspiracies were interdependent and inextricably linked and that Mr. Woodmore was a participant in both conspiracies. And, likewise, a reasonable juror (with that frame of reference) would have had a substantial basis for inferring that Mr. Woodmore knew that the $2,000 that he attempted to transfer to Ms. Noel's brother was proceeds of the Woodmore organization's methamphetamine-trafficking enterprise and that he made the transfer with the intent to further that enterprise.[18]

---

[18]    This line of evidence directly rebuts Mr. Woodmore's argument that specifically challenges his conviction on Count Nine—*viz.*, that "because there was no evidence that this transaction was part of a scheme to launder money, there is insufficient evidence to support the money laundering conspiracy charge." Aplt.'s Opening Br. at 27–28. As we have highlighted, there was plentiful evidence that Mr. Woodmore's attempted $2,000 payment was part of a scheme to launder money

Third, although Early also agreed to receive shipments of merchandise from Ms. Noel, a reasonable juror could find that receiving this merchandise was an effort by the Woodmore organization to appease Ms. Noel and maintain her good will as its methamphetamine supplier. Hence, even if the attempted $2,000 transfer was in whole or part for merchandise, it was nonetheless part and parcel of the Woodmore organization's methamphetamine-distribution activities. In this regard, there was a lack of separation between the merchandise arrangement and the methamphetamine arrangement. For example, the Woodmore organization sent Ms. Noel money for both the methamphetamine and the merchandise through the same platforms— MoneyGram and Western Union. Of the ninety-three packages sent by Ms. Noel to the Woodmore organization that law enforcement identified, investigators were unable to determine which of the packages contained methamphetamine and which contained merchandise.

Next, the one-sided nature of the merchandise arrangement signals that an ulterior motive of the Woodmore organization was at play. Ms. Noel testified that the Woodmore organization would pay her significant money—sometimes up to "a couple of thousands of dollars"—for merchandise that she purchased for as low as "a dollar." *See id.* at 229, 252–56. And when asked if Early resold this merchandise in Oklahoma for a profit, she responded: "I don't know what he was doing with it. I guess." *Id.* at 256. No witness at trial testified that the Woodmore organization ever

---

based on the interdependence and inextricable linkage between the money laundering conspiracy and the methamphetamine-trafficking conspiracy.

resold this merchandise in Oklahoma.  In addition, Ms. Noel testified that she had previously borrowed $3,000 that the Woodmore organization sent to her as a loan and kept approximately $5,000 to buy a new car.  Both amounts far exceeded the $500 finder's fee that Ms. Noel typically retained as her cut of the drug proceeds and were in addition to the portion of the proceeds Ms. Noel routinely reinvested into future purchases of methamphetamine.  Ms. Needham confirmed this unique business relationship between the Woodmore organization and Ms. Noel, noting that Early "was supposed to send [Ms. Noel] money for bills and cars and stuff like that." *Id.* at 158.

Altogether, this evidence illustrates that the Woodmore organization cultivated an asymmetric relationship with Ms. Noel whereby it was comfortable with her receiving a sizable profit for merchandise that it apparently was not reselling in Oklahoma and for her to keep additional money—for personal bills and a car purchase—that she would not later reinvest into methamphetamine inventory.[19]  From this evidence, a reasonable juror could infer that the Woodmore organization paid Ms. Noel for the merchandise to ensure that she would continue to act as its methamphetamine supplier, thereby intentionally using the merchandise payments to further the methamphetamine-trafficking enterprise.

---

[19]     Although it is unclear if the Woodmore organization was aware of the precise amount of profit Ms. Noel was making on the merchandise she mailed to the organization, Ms. Noel did testify that she told Early that she was purchasing the merchandise for low prices.  *See* R., Vol. IV, at 254 ("I told [Early] I was buying [the merchandise] at the clearance department at Angel View.").

We note that none of the foregoing testimony constitutes direct evidence that the merchandise was purchased to appease Ms. Noel. But direct evidence is not required when reviewing evidence of a defendant's guilt on appeal. *See United States v. Evans*, 970 F.2d 663, 668 (10th Cir. 1992) ("[T]he government may establish these elements by direct *or circumstantial* evidence." (emphasis added)). Rather, we are instructed to construe circumstantial evidence in the light most favorable to the government and to resolve reasonable inferences in the government's favor, and in this case a reasonable juror could find that the merchandise arrangement between Ms. Noel and the Woodmore organization was part and parcel of the methamphetamine arrangement. *See United States v. Cordova*, 25 F.4th 817, 824 (10th Cir. 2022) ("[W]e ask 'only whether, taking the evidence—both direct and circumstantial, together with reasonable inferences to be drawn therefrom—in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt.'" (quoting *United States v. Baldridge*, 559 F.3d 1126, 1134 (10th Cir. 2009))). And even if the foregoing evidence did not rule out other reasonable hypotheses that potentially explain the merchandise arrangement, that does not alter our conclusion that a reasonable juror could infer, based on substantial evidence, that this arrangement was part and parcel of the Woodmore organization's criminal activities. *See Erickson*, 561 F.3d at 1158–59 ("While the evidence supporting the conviction must be substantial and do more than raise a mere suspicion of guilt, it need not conclusively exclude every other reasonable hypothesis

and it need not negate all possibilities except guilt." (quoting *Burkley*, 513 F.3d at 1188)).

When viewing in combination these three lines of evidence, *viz.*—(1) Mr. Woodmore's significant role in the Woodmore organization's illicit activities, (2) the interdependence and inextricable linkage between the methamphetamine-distribution conspiracy and the money-laundering conspiracy, and (3) the part-and-parcel relationship between the merchandise arrangement and the methamphetamine-distribution arrangement—a reasonable juror could have concluded that Mr. Woodmore knew that the $2,000 he attempted to transfer to Ms. Noel's brother were proceeds of the Woodmore organization's unlawful methamphetamine-distribution activities and that he attempted to send that money at the behest of Early and Ms. Noel with the intention of furthering those distribution activities. In other words, based on those lines of evidence, a reasonable juror could have convicted Mr. Woodmore of both Counts Nine and Thirteen. Accordingly, we conclude that the district court did not err in denying Mr. Woodmore's Rule 29 motion as to Counts Nine and Thirteen. *See Murphy*, 100 F.4th at 1195; *Gabaldon*, 389 F.3d at 1094.

Resisting this conclusion, Mr. Woodmore raises two arguments in favor of reversal, each of which we find unconvincing. First, he suggests that there was no evidence that the $2,000 at issue was wired from drug proceeds because Mr. Woodmore had a legitimate source of income aside from the Woodmore organization's methamphetamine-distribution activities. We reject this argument based on the evidence presented at trial. For example, a witness who knew Mr.

53

Woodmore—Ms. Needham—testified that she was unaware of Mr. Woodmore having a job during the period of the Woodmore organization's drug-distribution activities. Additionally, a MoneyGram spreadsheet introduced at trial listed Mr. Woodmore's occupation as "retire[d]." R., Suppl. Vol. I, at 4. Viewing this evidence in the light most favorable to the government, a reasonable juror would have had a substantial basis to infer that the $2,000 that Mr. Woodmore attempted to wire to Ms. Noel's brother was drug proceeds (as well as a substantial basis to infer that Mr. Woodmore knew this). *See United States v. Hardwell*, 80 F.3d 1471, 1483 (10th Cir. 1996) ("Evidence that a defendant was engaged in drug trafficking[] and had insufficient legitimate income to produce the money used in a transaction is sufficient to establish that the money was derived from proceeds of drug distribution.").

In support of his argument, Mr. Woodmore can only point to testimony that Early had a horse-related business to which Mr. Woodmore contributed. However, Ms. Miller testified that Early made very little money from this business, and Ms. Needham testified that Mr. Woodmore only helped Early to a limited extent with the horses. Consequently, a reasonable juror could have inferred that it was highly unlikely that this business was capable of providing Mr. Woodmore with meaningful income—including the $2,000 that he attempted to send to Ms. Noel's brother. More to the point, this other-income evidence was far too meager to preclude a reasonable juror from finding beyond a reasonable doubt—based on the totality of the evidence viewed in the light most favorable to the government—that the $2,000 that Mr.

Woodmore attempted to transfer were proceeds derived from the Woodmore organization's drug-distribution activities. *See Murphy*, 100 F.4th at 1196; *see also Porter*, 745 F.3d at 1050 ("[W]e do not weigh conflicting evidence or consider witness credibility, and the fact that prosecution and defense witnesses presented conflicting or differing accounts at trial does not necessarily render the evidence insufficient." (alteration in original) (quoting *Cooper*, 654 F.3d at 1115)).

Second, Mr. Woodmore suggests that the only evidence shedding light on the purpose of the wire transfer was testimony from Ms. Noel, "who testified that the $2,000 wire transfer could have been for merchandise." Aplt.'s Opening Br. at 28. However, as we demonstrated *supra*, a reasonable juror could have found that the merchandise arrangement between Ms. Noel and the Woodmore organization was part and parcel of the methamphetamine arrangement, such that Mr. Woodmore's attempted wire transfer of the $2,000 to Ms. Noel's brother was in furtherance of the Woodmore organization's drug-distribution activities—even if that precise payment was for merchandise. More specifically, a reasonable juror could have found that the merchandise arrangement was an attempt by the Woodmore organization to appease Ms. Noel and maintain her status as the organization's methamphetamine supplier. Accordingly, whether Ms. Noel was aware of it or not, a reasonable juror could have found that Mr. Woodmore's attempted wire transfer of the $2,000 payment to Ms. Noel's brother was intended to further the drug-distribution activities of the Woodmore organization. As a result, Ms. Noel's inability to remember the purpose of the attempted transfer is immaterial.

In sum, we conclude on de novo review that the district court did not err by denying Mr. Woodmore's motion for a judgment of acquittal under Rule 29 for Count Nine and Count Thirteen because a reasonable juror could have convicted him of both counts based on the evidence presented at trial.

C

We last review Mr. Woodmore's various challenges to the district court's calculation of his sentence.  Mr. Woodmore argues that the trial court erred by overruling his objections to five separate paragraphs of the PSR.  He subsequently argues that the district court's calculation of the drug weight used in setting his Guidelines base offense level was "not procedurally reasonable" because "the court's factual findings were clearly erroneous."  Aplt.'s Opening Br. at 43 (bold-face font omitted).

1

When a defendant challenges the district court's calculation of his Guidelines sentence, we review the court's actions for procedural reasonableness.  *See, e.g.*, *United States v. Conley*, 89 F.4th 815, 820 (10th Cir. 2023).  Within that framework, "[w]e review the district court's legal conclusions under the Sentencing Guidelines de novo and its findings of fact for clear error, 'giving great deference to the district court's application of the Guidelines to the facts.'"  *United States v. Cifuentes-Lopez*, 40 F.4th 1215, 1218 (10th Cir. 2022) (quoting *United States v. Evans*, 782 F.3d 1115, 1117 (10th Cir. 2015)).  "Under this standard of review, we will not disturb the district court's factual findings unless they have no basis in the record, and we view

the evidence and inferences therefrom in the light most favorable to the district court's determination." *United States v. Hoyle*, 751 F.3d 1167, 1174 (10th Cir. 2014). "To constitute clear error, we must be convinced that the sentencing court's finding is simply not plausible or permissible in light of the entire record on appeal, remembering that we are not free to substitute our judgment for that of the district judge." *United States v. Porter*, 928 F.3d 947, 962–63 (10th Cir. 2019) (quoting *United States v. McClatchey*, 316 F.3d 1122, 1128 (10th Cir. 2003)); *see also Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985) ("If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").

"If we find a procedural error, resentencing is required only if the error was not harmless." *United States v. Gieswein*, 887 F.3d 1054, 1061 (10th Cir. 2018) (quoting *United States v. Sanchez-Leon*, 764 F.3d 1248, 1262 (10th Cir. 2014)). "Procedural error is harmless 'if the record viewed as a whole clearly indicates the district court would have imposed the same sentence had it not relied on the procedural miscue(s).'" *Id.* (quoting *United States v. Kieffer*, 681 F.3d 1143, 1165 (10th Cir. 2012)). The government has the burden of demonstrating the error was harmless by a preponderance of the evidence. *Id.* But "we are compelled to remand for resentencing when we find . . . that an improper offense level . . . was applied."

*Kieffer*, 681 F.3d at 1169 (first omission in original) (quoting *United States v.*

*Urbanek*, 930 F.2d 1512, 1516 (10th Cir. 1991)).

"A defendant is accountable for all reasonably foreseeable drug quantities that

were within the scope of the jointly undertaken criminal activity." *United States v.*

*Dahda*, 852 F.3d 1282, 1293 (10th Cir. 2017).[20]  "In examining the record, we must

determine whether the district court could reasonably have found that the government

had satisfied its burden on foreseeability by a preponderance of the evidence." *Id.*

---

[20]    Under the Guidelines, the drug quantity that is attributable to a defendant "shall be determined on the basis of the following:"

> (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

> (B) in the case of jointly undertaken activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were–

> (i)    within the scope of the jointly undertaken activity,
> (ii)    in furtherance of that criminal activity, and
> (iii)    reasonably foreseeable in connection with that criminal activity; that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense[.]

U.S.S.G. § 1B1.3(a)(1).

**2**

**a**

Mr. Woodmore first challenges the district court's adoption of the factual findings in Paragraph 24 of the PSR.  Paragraph 24 links Mr. Woodmore to the package containing 439.9 grams of pure methamphetamine—which was shipped to the motel in Rogers, Arkansas—through two phone calls that Mr. Woodmore placed to Ms. Adcock.  Paragraph 24 of the PSR reads:

> On August 15, 2019, **Calvin Woodmore** placed two [] phone calls, which were recorded, to Valerie Adcock from the Haskell County Jail.  In the calls, **C. Woodmore** references the delivery of a package of narcotics that appear[s] to be missing.  He asks [Ms. Adcock] if she, "Got ahold of ol' boy," to which she replies, "It's not there yet."  **C. Woodmore** is then heard telling someone in the background, "It's not there yet."  Later, he again asks her about when the package will arrive.  She states, "I don't know, Amber's not around me."  **C. Woodmore** states, "Well ask her," to which [Ms.] Adcock replies, "How do you want me to do it?"  The next day, on August 16, 2019, U.S. Postal Inspectors intercepted a package from "Leanne Miles" of Palm Springs, California, destined for "Janet Jones" at the Eighth Street Motel in Rogers, Arkansas. . . .  According to a DEA lab report, the parcel contained 439.9 grams of methamphetamine (actual).

R., Vol. III, at 184 ¶ 24.  Mr. Woodmore argues that there was insufficient evidence tying him to this methamphetamine shipment.  Characterizing the telephone conversation as "vague," Mr. Woodmore explains it was "too speculative of a connection to use this conversation to hold [Mr.] Woodmore accountable for any random drug shipment" and that "there is no evidence that [he] had any actual involvement with the purchase of the drugs intercepted by the [P]ostal [S]ervice." Aplt.'s Opening Br. at 34.  Finally, he contends that "[a]t most, the conversation

59

establishes that [he] was generally aware of a shipment of drugs being delivered," *id.*, which he reasons is only "[m]ere association with conspirators," and "is insufficient to prove participation in [the] conspiracy," *id.* (third alteration in original) (quoting *United States v. Williamson*, 53 F.3d 1500, 1518 (10th Cir. 1995)).

We conclude that the district court did not clearly err in adopting the factual findings in Paragraph 24 of the PSR.  Contrary to Mr. Woodmore's argument, there was ample evidence in the record to tie him to the 439.9 grams of methamphetamine (actual)—i.e., pure methamphetamine—shipped to Arkansas and seized by law enforcement on August 16, 2019.  The recorded jail calls show that Mr. Woodmore was deeply interested in the arrival of an object on the same day that a package of methamphetamine was due to arrive in Arkansas.  *See* Aplee.'s Suppl. R., Vol. II, Ex. 71.  In this regard, Mr. Woodmore referred to this object as "it" and twice called his wife, Ms. Adcock, to check on the status of the object's arrival.  *Id.*  A DEA agent testified that, in his professional opinion, Mr. Woodmore was referring to a methamphetamine shipment during these calls.  Mr. Woodmore appeared to use code language in referring to the object—calling it "ol' boy."  And during the second call, Ms. Adcock explained that she did not have more information on the pending arrival because she was not with Amber, who had replaced Early as the coordinator of methamphetamine shipments for the Woodmore organization after Early's arrest.

Considering these facts, we cannot conclude that the district court clearly erred in holding Mr. Woodmore responsible for the 439.9 grams of methamphetamine (actual) that was shipped to Arkansas.  *See Hoyle*, 751 F.3d at 1174; *Porter*, 928 F.3d

at 962; *United States v. Sloan*, 65 F.3d 861, 865 (10th Cir. 1995) (noting that, at sentencing, "a defendant is responsible for 'all quantities . . . with which he was directly involved and . . . all reasonably foreseeable quantities . . . that were within the scope of the criminal activity that he jointly undertook.'" (omissions in original) (quoting U.S.S.G. § 1B1.3, cmt. n.2)).  To the contrary, there was plentiful evidence to support the court's adoption of the factual findings in Paragraph 24.  Mr. Woodmore's contention that this evidence proves only that he associated with co-conspirators and had knowledge of their crimes is belied by the record.  Put simply, there was more than enough evidence for the court to have plausibly found that, contrary to Mr. Woodmore's contention that he merely associated with others involved in shipping the methamphetamine, he was an active participant in coordinating that shipment.  *See Williamson*, 53 F.3d at 1518.

Irrespective of other mitigating inferences that the court *could have* drawn from the record evidence, it was not clearly erroneous for the court to draw the inferences that it did in adopting the factual findings of Paragraph 24 and holding Mr. Woodmore responsible for the 439.9 grams of methamphetamine (actual) that was shipped to Arkansas.  *See Porter*, 928 F.3d at 962–63 (explaining that "[w]e are not free to substitute our judgment for that of the district judge").  Accordingly, we reject Mr. Woodmore's challenge to the court's action.

**b**

Mr. Woodmore also attacks the district court's adoption of the factual findings

in Paragraph 25 of the PSR.  Paragraph 25 of the PSR reads:

> On November 26, 2019, investigators spoke with Ashely [sic]
> Miller, Early Woodmore's ex[-]girlfriend.  She advised she was
> aware that packages were sent from California to the home of
> **Calvin Woodmore** and his wife, Valerie Adcock.  The drugs
> would then be transported to the home of Amber Woodmore,
> located . . . in McAlester.  The drugs would be opened and broken
> down into smaller quantities by Dennis Marshall and **C.
> Woodmore**.  [Ms.] Miller reported she had witnessed Early give
> ounce-quantities of methamphetamine to **C. Woodmore**, Dennis
> Marshall and Prentice Keith for further distribution.

R., Vol. III, at 184 ¶ 25.  Mr. Woodmore asserts that "there is no evidence that [he]

or [Ms.] Adcock[] were aware [of] or set up these drug shipments," and that instead,

"the evidence reflects that another member of the [Woodmore organization] would

simply come and pick up the shipments they arranged to have delivered to the

residence."  Aplt.'s Opening Br. at 35.  He also notes that "[Mr.] Woodmore himself

was in jail for almost the entire time frame the alleged shipments were taking place"

in arguing that neither he nor Ms. Adcock could have been aware of the drug

shipments and that Ms. Miller could not have witnessed Mr. Woodmore receiving

ounce quantities of methamphetamine from Early.  *Id.* at 35–36.

We conclude that the district court did not clearly err by adopting the factual

findings in Paragraph 25.  There was adequate record evidence to support the district

court's adoption of the factual findings in this paragraph.  The first portion of

Paragraph 25 that Mr. Woodmore challenges—that Ms. Miller "was aware" that

packages were sent to the home of Mr. Woodmore and Ms. Adcock and that Mr. Woodmore and Mr. Marshall would open the drug packages and break them into smaller quantities—is clearly supported by the record. Ms. Miller testified in detail about the Woodmore organization's activities based on her relationship with Early, the leader of the organization. She explained that she was previously romantically involved with Early, during which time she was "knowledgeable about" Early's methamphetamine-trafficking activities. R., Vol. IV, at 298, 303. For example, Ms. Miller listed the various members of the Woodmore organization that Early associated with and explained how Early obtained the methamphetamine from Ms. Noel and later sold it.

After establishing her knowledge of the Woodmore organization's activities, Ms. Miller then testified that Ms. Adcock would receive packages at the home she shared with Mr. Woodmore and that, once the packages arrived, Mr. Woodmore and Mr. Marshall would split the methamphetamine into smaller quantities. Taking into account Ms. Miller's experience witnessing the Woodmore organization's activities firsthand, the district court could—at the very least—plausibly determine that there was a sound basis in the record to support Paragraph 25's findings and to adopt them in sentencing Mr. Woodmore. *See Hoyle*, 751 F.3d at 1174 ("[W]e will not disturb the district court's factual findings unless they have no basis in the record, and we view the evidence and inferences therefrom in the light most favorable to the district court's determination.").

63

Although Mr. Woodmore argues that "there is no evidence that [he] or [Ms.] Adcock[] were aware [of] or set up these drug shipments," Aplt.'s Opening Br. at 35, the statement in Paragraph 25 that Mr. Woodmore challenges does not relate to that subject: instead, it only posits that *Ms. Miller* was aware that Mr. Woodmore *received* packages, *see* R., Vol. III, at 184 ¶ 25. And while Mr. Woodmore argues that "the evidence reflects that another member of the [Woodmore organization] would simply come and pick up the shipments," Aplt.'s Opening Br. 35, he cites no record evidence to support this assertion. By contrast, Ms. Miller's testimony provides ample evidence that Mr. Woodmore was involved with these shipments upon their arrival at his residence.

The second portion of Paragraph 25 that Mr. Woodmore challenges—that Ms. Miller "witnessed" Early give ounces of methamphetamine to Mr. Woodmore—is similarly supported by Ms. Miller's trial testimony. *See* R., Vol. IV, at 315–17. While Mr. Woodmore argues that he was in prison for most of the time during which the alleged shipments were taking place, there was still a period of time when Ms. Miller could have witnessed Mr. Woodmore receive methamphetamine from Early. Ms. Miller testified that she was romantically involved with Early until his arrest in April 2019, so although Mr. Woodmore was in prison until late February 2019, she nonetheless could have witnessed Early give Mr. Woodmore ounces of methamphetamine in March 2019, albeit for a limited period of time. This inference is consistent with Ms. Miller's testimony that she only saw Mr. Woodmore handle

methamphetamine on a few occasions. *See id.* at 311 ("Q. How often would you see

Calvin with methamphetamine?  A. I hardly seen Calvin, so just a few times.").

It appears Mr. Woodmore's objection to the district court's adoption of the

factual findings in Paragraph 25 stems largely from a belief that Ms. Miller's

testimony was not credible. *See* Aplt.'s Opening Br. at 36 ("Without something more

than the baseless allegations of a demonstrated liar, there is insufficient evidence to

establish the facts set forth in Paragraph [] 25.").  But on appeal of a district court's

sentence, we do not reweigh witness credibility. *See Sloan*, 65 F.3d at 865 ("The

credibility of a witness whose testimony is relied upon at sentencing is for the

sentencing court to analyze."); *United States v. Sweargin*, 935 F.3d 1116, 1123 (10th

Cir. 2019) ("[T]he district court's determination of a witness's credibility at a

sentencing hearing is virtually unreviewable on appeal." (quoting *United States v.

Virgen-Chavarin*, 350 F.3d 1122, 1134 (10th Cir. 2003))).[21]

Accordingly, the district court did not clearly err in adopting the challenged

factual findings of Paragraph 25 of the PSR.

c

Next, Mr. Woodmore challenges the district court's adoption of the factual

findings in Paragraph 26 of the PSR. *See* Aplt.'s Opening Br. at 36.  At sentencing,

---

[21]      In addition, notwithstanding Ms. Miller's testimony, the government's
log of packages established an independent and sufficient basis for the court to find
that Ms. Noel sent packages to Mr. Woodmore's residence.  Consequently, any
potential error in the district court resting on the contested findings in Paragraph 25
would be harmless. *See Gieswein*, 887 F.3d at 1061.

the district court adopted the PSR that Probation prepared, and the PSR recommended a two-level enhancement to Mr. Woodmore's base offense level because Mr. Woodmore allegedly used violence as part of his involvement with the Woodmore organization.  Paragraph 26 of the PSR reads:

> During the investigation, **Calvin Woodmore** was often described by others as the [Woodmore organization's] enforcer.  On March 9, 2020, investigators spoke with Choice Lynn Needham, one of Early's ex[-]girlfriends.  She identified his brother **C. Woodmore** as the "enforcer" of the organization who would collect money from people who owed the [Woodmore organization], and that she witnessed some of these beatings.  She also confirmed **C. Woodmore** received several packages at his home that were mailed by Kimberly Noel, and that he received two to three pounds of methamphetamine on a weekly basis.

R., Vol. III, at 184 ¶ 26.

Mr. Woodmore challenges this paragraph for insufficient evidence and for relying on a witness who was not credible.  He maintains that Probation's factual findings in this paragraph "were directly contradicted by Ms. Needham's trial testimony, wherein she . . . testified that she never saw [Mr.] Woodmore involved in the sale of methamphetamine or participate in any act of violence."  Aplt.'s Opening Br. at 36–37 (citing R., Vol. IV, at 177).  He contends that, because "investigative reports of [Ms. Needham's] [law enforcement] interviews" were never presented to the district court, the district court could not have assessed her credibility for itself.  *Id.* at 38.  And, finally, Mr. Woodmore attacks Ms. Needham's credibility by noting that she did not identify Mr. Woodmore as being involved in the conspiracy's activities in numerous pre-Indictment meetings with law enforcement.

66

Mr. Woodmore's arguments are not persuasive. First of all, both before the district court and on appeal, Mr. Woodmore has focused his arguments on Ms. Needham's perceived lack of credibility. But as a matter of law, we will not reevaluate Ms. Needham's credibility on appeal. *See Sloan*, 65 F.3d at 865; *Sweargin*, 935 F.3d at 1123. To illustrate, in *United States v. Virgen-Chavarin*, 350 F.3d 1122 (10th Cir. 2003), we did not reconsider a district court's credibility determination of a witness even though the witness "told several lies to a confidential informant while [the witness] was intoxicated one afternoon." *Id.* at 1134–35. Noting that a district court's determination of a witness's credibility at sentencing is "virtually unreviewable on appeal," we found no clear error in the district court's finding that the witness had testified truthfully under oath. *Id.* (quoting *United States v. Jones*, 160 F.3d 473, 480 (8th Cir. 1998)). Likewise, we will not second-guess the district court's tacit determination here that Ms. Needham was credible, which provided the essential underpinning for the court's acceptance of her statements (embodied in Paragraph 26) that identified Mr. Woodmore as the "enforcer" of the Woodmore organization, as well as the receiver of methamphetamine packages.

Furthermore, even if Ms. Needham's trial testimony was actually at odds with her statements embodied in Paragraph 26 of the PSR, that would simply mean that the record, as it relates to Ms. Needham's testimony, allowed for two plausible interpretations concerning Mr. Woodmore's role as an enforcer in the Woodmore organization and his alleged receipt of methamphetamine packages. By electing to accept one plausible interpretation over another, the district court could not have

67

clearly erred. *See Anderson*, 470 U.S. at 574 ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."); *see also id.* at 577 ("[Neither] interpretation of the facts is illogical or implausible. Each has support in inferences that may be drawn from the facts in the record; and if either interpretation had been drawn by a district court on the record before us, we would not be inclined to find it clearly erroneous."). Therefore, even if Mr. Woodmore is correct in contending that the PSR's findings concerning Ms. Needham's statements in Paragraph 26 "were directly contradicted by Ms. Needham's trial testimony," Aplt.'s Opening Br. at 36, that would not establish that the district court clearly erred by adopting those PSR findings in Paragraph 26.

To be sure, Mr. Woodmore's briefing could be read as questioning the propriety of the district court considering Ms. Needham's statements in Paragraph 26 in the first place. In this regard, he notes that "the[] reports [that originally contained Ms. Needham's statements] were never presented to the sentencing court" so "the trial court could not have properly determined that [the statements] had sufficient indicia of reliability to support the contested facts." *Id.* at 37. However, Mr. Woodmore did not voice to the district court this concern regarding the absence of the law enforcement reports containing Ms. Needham's statements; rather, he expresses this concern for the first time on appeal. *Compare* R., Vol. III, at 130–32, *with* Aplt.'s Opening Br. at 37. And because Mr. Woodmore has not requested plain-error review of this argument, it is effectively waived. *See United States v. McBride*, 94 F.4th 1036, 1045 (10th Cir. 2024) ("Because [Defendant] both failed to preserve

her arguments below and failed to argue plain error here, her arguments have 'come

to the end of the road and [are] effectively waived.'" (second alteration in original)

(quoting *Fish v. Kobach*, 840 F.3d 710, 729–30 (10th Cir. 2016))).[22]

In sum, we conclude that the district court did not clearly err in adopting the

factual findings of Paragraph 26.

**d**

Mr. Woodmore also challenges the district court's adoption of the factual

findings in Paragraph 30 of the PSR.  Paragraph 30 reads, in relevant part:

> On June 21, 2021, an interview was conducted with Kimberly
> Diana Noel in reference to her role in the Woodmore drug
> trafficking organization. . . .  U.S. Postal Service records indicate
> [Ms.] Noel sent [eleven] parcels to the home of **C. Woodmore** and

---

[22]    Furthermore, Mr. Woodmore's singular focus on Ms. Needham's statements in Paragraph 26 in attempting to undermine the district court's findings that Mr. Woodmore was the "enforcer" for the Woodmore organization and that he was the recipient of packages of methamphetamine at the organization's behest is misplaced in any event.  The district court did not rest its enforcer finding on Ms. Needham's statements alone.  Instead, the district court relied on other, independent and sufficient evidence that supported Probation's assessment that Mr. Woodmore was the "enforcer" of the Woodmore organization—using violence in furtherance of the organization's methamphetamine-distribution activities.  The district court intimated as much in its sentencing remarks, pointing to the testimony of Mr. Eaton and Ms. Kennedy.  *See* R., Vol. IV, at 858 ("Now, defendant also objects to application of a two-level enhancement . . . because he claims there is insufficient evidence that he was an 'enforcer' in a drug trafficking organization.  Again, this enhancement is based on evidence presented at trial, including testimony of assault victims Dennis Eaton and Anjel Kennedy.").  Indeed, both Mr. Eaton and Ms. Kennedy testified at trial that Mr. Woodmore assaulted Mr. Eaton in connection with the Woodmore organization's drug-trafficking activities.  Likewise, the trial record independently provided ample evidence that Mr. Woodmore received methamphetamine packages on behalf of the Woodmore organization.  Hence, any potential error by the district court in relying in part on the contested findings in Paragraph 26 related to Ms. Needham's statements would necessarily be harmless.  *See Gieswein*, 887 F.3d at 1061.

Valerie Adcock between December 31, 2018, and February 26, 2019. The amount of narcotics she sent would vary, but [Ms.] Noel reported that at a minimum, each package contained [four] ounces of methamphetamine. As such, **C. Woodmore** is accountable for receiving [forty-four] ounces of methamphetamine (mixture) sent to him by Kimberly Noel.

R., Vol. III, at 185–86 ¶ 30. The PSR recommended that Mr. Woodmore be held accountable for forty-four ounces of a mixture containing methamphetamine based on the eleven packages sent to the home of Mr. Woodmore and Ms. Adcock, with a minimum of four ounces of methamphetamine in each of those packages.

On appeal, Mr. Woodmore contends that "there is not sufficient evidence to establish that the total amount of methamphetamine shipped to [Mr.] Woodmore by [Ms.] Noel was [forty-four] ounces" because Ms. Noel shipped the Woodmore organization both methamphetamine and merchandise such that "at least a portion of the [eleven] shipments would not have been methamphetamine." Aplt.'s Opening Br. at 40–41. Second, he argues that "even if the government could establish that [eleven] shipments of methamphetamine were delivered to [Mr.] Woodmore's residence, it does not establish that [Mr.] Woodmore had any connection to them," because Mr. Woodmore was incarcerated from November 28, 2018, to February 27, 2019, and the shipments at issue occurred between January 4, 2019, and March 1, 2019. *Id.* at 41. We begin with this second contention.

The Postal Service logged eleven packages shipped to the home of Mr. Woodmore and Ms. Adcock between January 4, 2019, and March 1, 2019. Mr. Woodmore was incarcerated between October 23, 2018, and February 27, 2019, so he

was released two days before the final package that law enforcement identified was shipped to his home. Unlike the August 16, 2019, shipment to the Arkansas motel, the government did not adduce evidence at trial that Mr. Woodmore actively coordinated the delivery of these eleven packages.

However, Mr. Marshall testified at trial that—in November 2018, when he and Mr. Woodmore were incarcerated together in the Pittsburg County Jail—Mr. Woodmore directed him to "get with" Early upon his release for the purpose of distributing methamphetamine. R., Vol. IV, at 600–01. Based on this evidence, the district court could have plausibly inferred that Mr. Woodmore was involved with the Woodmore organization's conspiracy during the period of incarceration in question. *See Hoyle*, 751 F.3d at 1174; *Porter*, 928 F.3d at 962.

Moreover, Mr. Woodmore's continued participation in the activities of the Woodmore organization soon after his release from jail in February 2019, *see* R., Vol. IV, at 629–31, as well as his knowledge of the August 16, 2019 shipment to Arkansas during his second period of incarceration, *see* R., Vol. IV, at 773–74, 784; Suppl. R., Vol. II, Ex. 71, Ex. 72, create a strong inference that Mr. Woodmore continued his criminal involvement with the drug-distribution activities of the Woodmore organization while incarcerated from October 23, 2018, through February 27, 2019. *See Dahda*, 852 F.3d at 1293 (concluding that the drugs at issue were reasonably foreseeable to the defendant because the defendant was "aware of the drug distribution network and participated in that network" even if the defendant was "not personally linked" to the specific shipments).

Although far from overwhelming, this evidence was enough to attribute the forty-four ounces of methamphetamine to Mr. Woodmore. For instance, in *United States v. Edwards*, 69 F.3d 419 (10th Cir. 1995), we upheld the district court's attribution of drugs trafficked while the defendant was in federal custody because the record showed that the defendant "continued in the endeavors of the conspiracy during that period of incarceration." *Id.* at 439 (internal quotation marks, brackets, and citation omitted).

To be sure, we have previously affirmed the decisions of sentencing courts to exclude from the attribution calculation as to a defendant any drugs that were distributed while the defendant was incarcerated. *See Dahda*, 852 F.3d at 1293 (affirming the district court's drug quantity calculation by observing that the "district court did not pin [the defendant] with all of the drugs involved in the conspiracy; instead, the court excluded marijuana that had been dealt while [the defendant] was in prison"); *cf. United States v. Rodriguez*, 285 F. App'x 518, 521 (10th Cir. 2008) (upholding the district court's quantity determination in part because a crucial witness made clear that he engaged in drug deals with the defendant *after* the defendant was released from prison). However, given the evidence that Mr. Woodmore's incarceration did not prevent him from continuing to participate in the Woodmore organization's drug-distribution activities, the district court could plausibly find from the record that the forty-four ounces of methamphetamine shipped by his co-conspirators were reasonably foreseeable to Mr. Woodmore. *See Hoyle*, 751 F.3d at 1174; *Dahda*, 852 F.3d at 1293.

Therefore, viewing the evidence and all related inferences "in the light most favorable to the district court's determination," *Hoyle*, 751 F.3d at 1174, we believe that the district court's attribution to Mr. Woodmore of the eleven packages of methamphetamine that his co-conspirators shipped to the home he shared with Ms. Adcock was not clearly erroneous.

We likewise reject Mr. Woodmore's argument that the eleven packages shipped to his home could not have contained forty-four ounces of methamphetamine because Ms. Noel also sent merchandise to the Woodmore organization. Relevant here, we have held that "[w]hen the actual drugs underlying a drug quantity determination are not seized, the trial court may rely upon an estimate to establish the defendant's guideline offense level so long as the information relied upon has [factual support] and bears sufficient indicia of reliability." *United States v. Williams*, 48 F.4th 1125, 1133 (10th Cir. 2022) (internal quotation marks omitted) (quoting *United States v. Dalton*, 409 F.3d 1247, 1251 (10th Cir. 2005)).

In this case, Probation—and thereafter the district court, by adopting the PSR—based the estimate of forty-four ounces on Ms. Noel's statement in the PSR interview that she shipped, *at a minimum*, four ounces of methamphetamine per package. We conclude that Ms. Noel's testimony offered record support and "sufficient indicia of reliability" for the district court to have made its estimate. *Williams*, 48 F.4th at 1133 (quoting *Dalton*, 409 F.3d at 1251).

Mr. Woodmore's position that some of the eleven packages undoubtedly contained merchandise is unavailing because, as explained *supra*, Ms. Noel's

73

statements offered evidentiary support for the district court's assessment, and we view the evidence and all related inferences "in the light most favorable to the district court's determination." *Hoyle*, 751 F.3d at 1174. Furthermore, as the government points out, Probation's estimate was a *conservative* estimate. *See* Aplee.'s Resp. Br. at 37. At trial, Ms. Noel testified that she typically sent roughly one pound of methamphetamine per shipment. *See* R., Vol. IV, at 223–24. Thus, even if only three of the eleven packages tracked to Mr. Woodmore's home contained the typical amount of methamphetamine that Ms. Noel sent—that is, one pound (i.e., sixteen ounces), the district court's estimate of forty-four ounces would have been satisfied—indeed, exceeded (i.e., three shipments of sixteen ounces would equal forty-eight ounces). Therefore, the district court did not clearly err in following the conservative approach of Probation and limiting the attribution to forty-four ounces. *See United States v. Aragon*, 922 F.3d 1102, 1111 (10th Cir. 2019) ("[W]hen choosing between a number of plausible estimates of drug quantity, none of which is more likely than not the correct quantity, a court must err on the side of caution." (quoting *United States v. Richards*, 27 F.3d 465, 469 (10th Cir. 1994))).

At bottom, we affirm the district court's attribution of the forty-four ounces of methamphetamine to Mr. Woodmore because he was involved in the Woodmore organization's activities during his period of incarceration, and Probation's estimate of forty-four ounces was permissible in light of the record as a whole. *See United States v. Foy*, 641 F.3d 455, 468 (10th Cir. 2011) ("Factual findings regarding drug quantities are reviewed for clear error and are reversed only if the district court's

finding was without factual support in the record or we are left with the definite and firm conviction that a mistake has been made." (quoting *Dalton*, 409 F.3d at 1251)).

Accordingly, the district court did not clearly err by adopting the factual findings in Paragraph 30 of the PSR.

**e**

Finally, Mr. Woodmore challenges the district court's adoption of Paragraph 31 of the PSR, which determined that he had engaged in money laundering on behalf of the Woodmore organization. Paragraph 31 reads:

> As noted previously, members of the [Woodmore organization] sent and received money transfers utilizing Bank of America accounts, or MoneyGram and Western Union money wires. These transactions were conducted with the intent to promote the carrying on of the distribution of controlled substances. On October 19, 2018, **C. Woodmore** transferred $2,000 via a wire transfer from a Walmart in McAlester, Oklahoma, to a Walmart in California.

R., Vol. III, at 186 ¶ 31. For this challenge, Mr. Woodmore essentially rehashes his Rule 29 challenge and maintains that "there was no evidence to suggest that this transfer was for the purpose of distributing drugs" because Ms. Noel testified that she could not remember whether the transfer was a payment for methamphetamine or for merchandise. Aplt.'s Opening Br. at 42. He separately argues that the amount of the wire transfer at issue—$2,000—"would not have even been the appropriate amount for purchasing methamphetamine" because "Ms. Noel testified that she sold methamphetamine for $3,200 a pound." *Id.* at 42.

For the reasons we explicated *supra* Section II.B.4, we conclude that the government presented ample evidence at trial that the attempted $2,000 wire transfer by Mr. Woodmore was made in furtherance of the methamphetamine-distribution activities of the Woodmore organization. And we need not repeat that analysis here. It is beyond peradventure that if the record evidence relating to the attempted $2,000 wire transfer was sufficient to support Mr. Woodmore's convictions beyond a reasonable doubt for money-laundering conspiracy and money laundering, it was sufficient to support the district court's adoption of the PSR paragraph that documented that transfer. Thus, the court necessarily did not clearly err in adopting Paragraph 31. *Cf. Torres*, 53 F.3d at 1144 (finding that, "[t]o constitute clear error, we must be convinced that the sentencing court's finding is simply not plausible or permissible in light of the entire record on appeal").

By the same token, Mr. Woodmore's secondary argument—that $2,000 was not the appropriate amount of money for purchasing methamphetamine—is unavailing. As we noted *supra* Section II.B.4, a reasonable factfinder could determine that, even if Mr. Woodmore intended to send the money for merchandise, the merchandise arrangement was part and parcel of the Woodmore organization's drug-distribution activities—serving the purpose of ensuring that Ms. Noel remained the Woodmore organization's methamphetamine supplier. In other words, the $2,000 need not have been the cost of a direct shipment of methamphetamine in order for an attempted wire transfer of that amount to further the drug-distribution activities of the

76

Woodmore organization and to support a charge of money laundering against Mr. Woodmore.

In any event, Mr. Woodmore's secondary argument is dubious based on the record. Specifically, Ms. Noel stated that she typically sent the Woodmore organization one pound of methamphetamine per shipment, and multiple witnesses testified that one pound of methamphetamine could cost about $2,000. Ms. Noel also testified that the price per pound of methamphetamine decreased over time and, by the end of her business dealings with the Woodmore organization, could sell for as low as $1,800. And regardless, even if we assume Mr. Woodmore is correct that the cost per pound of methamphetamine was $3,200, the district court would not have been clearly erroneous in concluding that the attempted $2,000 wire transfer constituted payment for a fraction of one pound of methamphetamine and thus was in furtherance of the drug-distribution activities of the Woodmore organization. *See* R., Vol. IV, at 232 (reflecting Ms. Noel's testimony that she sometimes sent "a half pound" of methamphetamine to Amber).

Accordingly, we conclude that the district court's adoption of the factual findings in Paragraph 31 did not amount to clear error.

**f**

Mr. Woodmore argues that "[b]ecause the court's factual findings were clearly erroneous, the trial court's findings regarding the total amount of drug weight attributed to [Mr.] Woodmore and the base offense level under [U.S.S.G. § 2D1.1] were not procedurally reasonable." Aplt.'s Opening Br. at 43 (bold-face font

omitted).  However, because we have concluded that the district court's adoption of the factual findings in each of the challenged PSR paragraphs was not clearly erroneous, we conclude that the district court's attribution of drug weight to Mr. Woodmore and its calculation of his base offense level were procedurally reasonable. *See Conley*, 89 F.4th at 820; *Gieswein*, 887 F.3d at 1061.  For these same reasons, we reject Mr. Woodmore's request to remand this case.  *See* Aplt.'s Opening Br. at 44.

### III

For the foregoing reasons, we **AFFIRM** the district court's judgment as to Mr. Woodmore's convictions and sentence.